## Case No. 10,031.

### The NATHANIEL HOOPER.

[See Case No. 10,032.]

17·FED.CAS.—75

## Case No. 10,032.

### The NATHANIEL HOOPER.

[3 Sumn. 542;[1] 2 Law Rep. 133, 165. 1 Hunt, Mer. Mag. 334.]

Circuit Court, D. Massachusetts. May Term, 1839.

AFFREIGHTMENT — GENERAL AVERAGE — VOYAGE WAIVED—CONTRIBUTION—PRIZE PROCEEDINGS—SALVAGE—DELIVERY OF SHIP—DETERIORATION OF CARGO.

1. Where a ship, bound from Havana to St. Petersburg, with a cargo of sugars, shipped in part on freight and in part on half profits, with a right to enter and clear at Boston, in order to obtain a clean bill of health, struck on the south shoal of Nantucket, and was there, after a jettison of part of her cargo, abandoned by the master and crew, and the ship afterwards floated off the shoal, and was met and brought into port by salvors, and there libelled for salvage; and the ship was there repaired and made ready for sea: but the cargo was in part sold on account of damage, and part sold to pay duties, and part was delivered on bail to underwriters, and part was held in the custody of the court; and the ship was ready to take on board the cargo, if ready, but afterwards, owing to the admiralty proceedings, she was sold; *held,* under all the circumstances of the case, that the full freight of the sugars, of which there was a jettison, for the voyage, was to be allowed as part of the general average to be borne by the ship and cargo, and the freight, (pro rata), saved.

[Cited in Hugg v. Augusta Insurance & Banking Co., 7 How. (48 U. S.) 606; The Julia Blake, Case No. 7,578.]

2. No freight was due upon the sugars, sold at Boston on account of damage and their perishable nature; nor upon the sugars sold to pay duties; nor upon the sugars applied to pay the salvage.

3. Full freight was not due for the voyage upon the sugars delivered to the underwriters; because the ship had been sold before they were delivered to them on bail by the court; and, taking all the circumstances, the case was to be treated as one, in which both the owners of the ship, and of this part of the cargo, had reluctantly acquiesced in waiving any further prosecution of the voyage, as to that part of the cargo.

[Cited in Sayward v. Stevens, 3 Gray, 104.]

4. Full freight was not due for the voyage for the sugars in the custody of the court; because neither party was in any default on account thereof, the detention being occasioned by the common calamity, and the proceedings for salvage; and the owners thereof never having been in a condition to re-ship them.

[Cited in The Harriman, 9 Wall. (76 U. S.) 172.]

[Cited in Leckie v. Sears, 109 Mass. 428.]

5. But a pro rata freight was due upon the sugars delivered to the underwriters, and upon those detained in the custody of the court, for the voyage from Havana to Boston, upon the ground that there had been a mutual dispensation, by both parties, of any farther prosecution of the voyage.

6. No claim for half profits was admissible, as the cargo never arrived at St. Petersburg, and non constat, that it ever would have arrived there, or if it had arrived, would have yielded any profit, the whole matter of profits resting in contingency.

7. The freight, earned pro rata for the voyage, ought to contribute to the salvage with the ship and cargo.

8. In general, freight for the entire voyage can only be earned by a due performance of the

[1] [Reported by Charles Sumner, Esq.]

voyage. The only acknowledged exception is, where there is no default or inability of the carrier-ship to perform the voyage, and the ship-owner is ready to forward them, but there is a default on the part of the owner of the cargo, or he waives a farther prosecution of the voyage.

[Cited in Donahoe v. Kettell, Case No. 3,980; Hart v. Shaw, Id. 6,155.]

[Cited in Brown v. Harris, 2 Gray, 360; Bailey v. Damon, 69 Mass. (3 Gray) 94; Indianapolis Ins. Co. v. Mason, 11 Ind. 189; Libby v. Gage, 14 Allen. 263; Love v. Sortwell. 124 Mass. 446. Cited in brief in Rogers v. West, 9 Ind. 407.]

9. Freight pro rata itineris is not ordinarily due, unless there has been a voluntary acceptance of the cargo at an intermediate port; and not where there has been an acceptance from mere necessity, occasioned by an overwhelming calamity or superior force.

[Cited in The Joseph Farwell, 31 Fed. 848.]

10. The doctrines of prize courts, in the administration of prize laws as to freight, are not generally applicable to cases of mere civil commercial adventures, or cases of civil salvage.

11. The capture of a neutral ship and cargo, if afterwards restitution is decreed, does not dissolve the contract of affreightment; but, at most, it only suspends it during the prize proceedings.

12. A mere unlivery of the cargo during the voyage, occasioned by prize proceedings, or by an overruling calamity, does not absolve the carrier ship from the obligation to carry the goods to the port of destination.

[Cited in The Star of Hope, Case No. 13,312.]

13. In case of prize proceedings, if a neutral ship, carrying a neutral cargo in no default, would earn her full freight, she must wait and be ready to take the cargo on to the port of destination, when restored; otherwise, at most (it seems), a pro rata freight only would be due.

14. The cases where freight has been allowed in prize proceedings reviewed.

15. Courts of admiralty have full jurisdiction, as incidental to cases of prize, and salvage, and other proceedings in rem, to decree freight to the ship owner in proper cases.

16. Where proceedings in rem are had in the admiralty for salvage, neither party is bound to obtain a delivery of the ship and cargo on bail; and it is no matter of default on either side, to wait for the regular termination of the salvage proceedings.

17. In suits for salvage, courts of admiralty will not ordinarily, without the consent of the salvors, deliver either ship or cargo on stipulation to the claimants, where, from the circumstances of the case, it is apparent to the court that a proportion, and not a specific or gross sum, ought to be allowed as salvage.

18. If the cargo is liable to deteriorate or perish, or the ship to be injured by the delay incident to the salvage proceedings, the proper course is to apply to the court for a sale thereof. It is not a matter of right of either party to have a delivery on bail in such cases.

19. Where a charter-party contained covenants that the general owner should equip, victual, man and sail the ship during the voyage, and carry the outward and homeward cargoes to their proper destinations, and the cabin and some part of the ship were retained by the owner; *held*, that the general owner remained owner for the voyage, although the cargoes were on joint account of himself and the co-charterer.

[Cited in Skolfield v. Potter, Case No. 12,925.]

[Cited in Sheriffs v. Pugh, 22 Wis. 276; Swift v. Tatner, 89 Ga. 660, 15 S. E. 844.]

20. Where the master agrees for a specific sum, half of a stipulated freight, to victual, man and navigate the ship on certain voyages under the direction of the owner, the master is not owner or part-owner for the voyage.

[Cited in Hill v. The Golden Gate, Case No. 6,491.]

21. The shipper of cargo is not entitled to salvage earned in the voyage, unless the stoppage and deviation were authorized by him. Under other circumstances, his only remedy for any loss, occasioned by the stoppage and deviation, is against the master and owner.

[Cited in The Colon, Case No. 3,024; The Persian Monarch, 23 Fed. 822, 823; The Dupuy de Lome, 55 Fed. 97; Compagnie Commerciale de Transport. etc., v. Charente Steamship Co., 9 C. C. A. 292, 60 Fed. 926.]

22. The grounds, on which salvage is allowed to the owner of the ship, stated, and the distinction between his case and that of the shipper of the cargo commented on and explained.

[Cited in The Camanche, 8 Wall. (75 U. S.) 473; The Persian Monarch, 23 Fed. 822, 823.]

23. In salvage cases the general rule is, to decree all the costs and charges in the case to be borne and paid by the property saved, and apportioned among the claimants according to their respective interests. The only admitted exceptions are, where the charges have been occasioned by the gross neglect or laches of the claimant, in which case they are to be borne by him; or where the right has been forfeited by the misconduct of the salvors, in which case the court refuse any allowance to them, and compel the guilty parties to bear their own costs, expenses and charges.

[Cited in The Liverpool Packet, Case No. 8,-407; The Dupuy de Lome, 55 Fed. 98.]

[Cited in Merithew v. Sampson, 4 Allen, 195.]

This was a suit for salvage, brought by appeal from the decree of the district court, awarding a salvage of one moiety of the ship Nathaniel Hooper, and cargo, to the salvors. After the appeal, the amount of salvage was adjusted between the libellants and the claimants, and the decree of the district court was, by consent, modified accordingly. The whole salvage awarded on the ship and cargo, was, by agreement, $25,000. The claim, now brought before the court, was that of the owners of the ship, for freight to be paid to them on the remainder of the cargo, not exhausted by the claim for salvage, upon the ground of the ordinary lien belonging to the owners of the ship. The facts necessary to the understanding of the case, are as follow: Nicholson Broughton was the owner of three quarters of the ship, and John Bogardus, the master, was owner of the remaining fourth part. In the month of June, 1838, the ship, being at Havana, in the island of Cuba, took on board a cargo of sugars, shipped by George Knight & Co., to be carried to St. Petersburg, via Boston, (the object of stopping at Boston being merely to obtain a clean bill of health,) part of the sugars being shipped for a specific freight, and part on half profits. By the bills of lading, part of the sugars (about one third) were consigned and deliverable to Messrs. Cramer Brothers, at St. Petersburg, or assigns, and the other two third parts to the order of Messrs. Holford

& Co. of London, or assigns. But the whole cargo was to be forwarded to Messrs. Cramer Brothers, at St. Petersburg, who were to sell the same, and hold the proceeds of two thirds, to extinguish the claims of Messrs. Holford & Co. on the same. The ship sailed on the voyage with the cargo, and in the course thereof, about the 8th of July, 1838, struck on the South Shoal, so called, of Nantucket Island, and was there left by the master and crew, after an unsuccessful jettison of part of the cargo, about 1,000 boxes of sugar. She afterwards floated off the shoal, and went adrift to sea. In this situation she was discovered by the brig Olive Chamberlain, and the mate and part of the crew thereof were placed on board. The ship had suffered by striking on the shoal, and leaked badly; she was put on the course for Boston; and afterwards fell in with a fishing schooner, the Climax, from which the assistance of an additional crew was obtained; and the ship then reached Boston about the 11th of July. Admiralty proceedings, in rem, were immediately (on the next day) had against the ship and cargo for salvage; the cargo was unlivered; a survey thereof was directed by the order of the court; and the surveyor having reported, that a large part thereof was in a perishable condition, it was ordered by the court, that all the damaged sugars should be sold; and they were accordingly sold on the 17th of July, by the marshal of the district. On the 17th of July, upon the claim and petition of the owners of the ship, she was ordered to be delivered up to them upon stipulation to pay the salvage. The ship being so delivered up, and Broughton, who had procured insurance on the freight and half profits, having abandoned his right thereto to the underwriters, they refused to accept the abandonment, but authorized him to go on and repair the ship. Messrs. Bates & Co., to whom the ship was consigned at Boston for entry and despatch (meaning for the purpose of obtaining a clean bill of health), were the agents of Messrs. Cramer Brothers, in many commercial transactions, but were not their general agents. They had procured insurance on the one-third of the cargo consigned to Messrs. Cramer, from certain insurance companies in Boston, and on the 10th of July, abandoned the same to those companies, who accepted the same, and, within sixty days afterwards, paid a total loss thereon. On the 30th of July, the ship being fully repaired, Broughton, with the consent of the underwriters, gave notice to Messrs. Bates & Co., of Boston, that the ship was repaired and in readiness to receive the cargo of sugars to be carried forward to St. Petersburg. Messrs. Bates & Co. replied by stating, that they had no knowledge of the cargo of sugars, and had taken no cognizance thereof, except under the direction of the marshal. On the 7th of August, Messrs. Broughton and Bogardus severally filed in the district court the claim and petition for freight, upon which the pres-

ent controversy turned, in which the foregoing facts were in substance stated. On the 8th of August, the libellants petitioned for an appraisement and sale of the residue of the cargo unsold, (the same being in the custody of the court), upon which an order was passed, on the 9th of October, by the court, to sell so much thereof as should be sufficient to pay the duties and charges due thereon; and it was accordingly sold by the marshal on the 24th of October. On the 10th of August, Broughton addressed letters to the Suffolk Insurance Company, the Columbian Insurance Company, and to William S. Skinner, agent for certain foreign underwriters, of a similar purport to his letter of the 30th of July to Messrs. Bates & Co. At this time the companies had not accepted the abandonment made to them respectively. On the 7th of September, one half of the ship was sold by the owners, and the other half on the 26th of the same month. It is a fact, also stated in the case, that Broughton was the owner of the brig General Glover, which arrived in Boston on the 27th of July, which was a good coppered vessel, and could have carried on the cargo to St. Petersburg, the harbor of which port closes with ice in October or November, and opens again in April or May of every year.

But to proceed with the historical facts. On the 2d of November, the Suffolk Insurance Company, the Columbian Insurance Company, and the Tremont Insurance Company, of Boston, to whom the one third of the sugars had been abandoned, and the abandonment had been accepted, and the loss paid as above mentioned, applied by claim and petition, to have the same appraised and delivered to them upon stipulation, which was accordingly granted by the court, no objection appearing to have been made thereto by any of the parties in interest before the court. On the 26th of February, 1839, Messrs. Bates & Co. addressed a letter to Broughton, for the owners of the ship, stating, that they had received advices from Messrs. Holford & Co., of London, to have the sound remaining sugars shipped to St. Petersburg without delay, asking him to decide either to send them forward, or not, so that application might be made to the court accordingly for a delivery on appraisement for that purpose; to which Broughton replied on the 1st of March, declining to have any thing farther done on his part in the business. On the same day, Messrs. Bates & Co. made application to the court for a delivery to them of the residue of the sugars in the custody of the court, belonging to Messrs. Holford & Co., and the underwriters on their account; which application was refused by the court; and the sugars still remained in the custody of the court. On the 15th of the same month, the insurance companies, which had underwritten upon the cargo, and Messrs. Bates & Co., for Holford & Co., intervened and made claim thereto, and answer to the

libels, in order to contest the claim to salvage. The final decree of the district court in the premises was made on the 11th of May, 1839, from which the present appeal was taken. The answer to the claim for freight was not put in the district court, the parties intending to appeal from the decree, and it was filed in this court by consent of all parties. It contested the general claim to freight, and insisted, that, if any whatever is due, it ought to contribute to the jettison as a general average, and ought to contribute towards the salvage, the latter having been apportioned by the decree on ship and cargo only.

Choate & Riley, for claimants.

Mr. Blair, Mr. Parsons, and B. R. Curtis, for respondents.

STORY, Circuit Justice. Such are the most material facts, in the present case, which are somewhat complicated, but all of which have been deemed important to be brought to the view of the court upon the present occasion. The question of freight has been accordingly argued under two aspects: (1) Whether a full freight is due upon any, and, if any, upon what part of the cargo; (2) if a full freight is not due, whether a pro rata freight is due upon any, and if upon any, upon what part of the cargo. There is certainly a great deal of novelty in some of the circumstances, under which the claim is presented; and the law, which ought to govern it, is by no means satisfactorily established in any of the authorities. To a certain extent, however, there are principles, which may safely conduct us to the correct conclusion.

There are one or two considerations presented by the case, which may be dismissed in a few words. In respect to the jettison of the cargo, it is clear, that it constitutes a case of general average, to be borne by the ship, freight, and cargo, ultimately saved; and of course in that contribution the entire freight of the cargo thrown overboard is to be added to the loss, as a part of the sacrifice, and is to be allowed to the ship-owners. This is the settled course in the adjustment of general average, and is so laid down in Lord Tenterden's work on the Law of Shipping. Abb. Shipp. (Am. Ed. 1829) pt. 3, c. 8, § 16, pp. 358–360. In respect to the sugars, which were damaged, and brought in and sold on account of their perishable nature, they are not liable to pay any freight whatsoever. As to them the entire voyage neither was, nor in fact could have been, performed, but it was defeated by an overwhelming calamity, common to the whole adventure, which made the sale a sale from necessity at an intermediate port. In such a case I conceive it to be now well settled, that no freight whatever is due. Many of the cases will be found collected in the text and the notes to the American edition of Abbott on Shipping, in 1829, pt. 3, c. 7, §§ 9–

17 f, and notes pp. 300–329. But the cases on which I mainly rely are Armroyd v. Union Ins. Co. 3 Bin. 437; Hurtin v. Union Ins. Co. [Case No. 6,942]; Callender v. Ins. Co. of North America, 5 Bin. 525; Gray v. Waln, 2 Serg. & R. 229; Marine Ins. Co. v. United Ins. Co., 9 Johns. 186; Caze v. Baltimore Ins. Co., 7 Cranch [11 U. S.] 358; Liddard v. Lopes, 10 East, 526; and Hunter v. Prinsep, Id. 378; and the learned Commentaries of Mr. Chancellor Kent. 2 Kent, Comm. (3d Ed.) lect. 47, pp. 228, 229. There has here been no voluntary acceptance of the damaged sugars at an intermediate port, dispensing with the farther carriage of them, but an involuntary sale from necessity, to prevent them from there perishing by a total loss. There is no principle, which would justify a pro rata freight under such circumstances. I am aware of the decision of Lord Stowell (then Sir William Scott), in the case of The Friends, Edw. Adm. 246, the circumstances of which case are not very fully stated; and it does not appear, whether the sale of the ship and cargo, to pay salvage on a recapture, was involuntary, or with the consent of the parties interested. Certainly it does not appear, that the goods were perishable and sold from necessity. It is fair, however, to state, that his lordship does not appear to have decided the case upon any such distinction; but upon the broad principle, that, as the loss arose from the common incapacity both of the ship and the cargo to perform the voyage by reason of the blockade of the port of destination, equity suggested, that the loss should be divided; and he accordingly directed the ship and cargo to be restored upon payment of a moiety of the freight for the voyage. The case, therefore, was disposed of upon circumstances not strictly applicable to the present; for the sale of the ship and cargo seems not to have been held lawful or justifiable. I must also say, with all deference to so great a judge, that the case does not stand upon principles entirely satisfactory. Certainly it is not consistent with the doctrine of the supreme court, in Caze v. Baltimore Ins. Co., 7 Cranch [11 U. S.] 358; and its authority, as far as applies to the present case, is overcome by his subsequent judgment in The Louisa, 1 Dod. 317.

In regard to the goods sold to pay the duties, it seems to me, that they fall under the like predicament. The sale was a natural, if not a necessary, consequence of the common calamity, and the unlading and other proceedings at the intermediate port, where the salvage was decreed; and therefore it was in a just sense proximate to the original cause of the loss. The owners were in no default for the sale, and were compelled to submit to it, as an involuntary, and not as a voluntary act—to discharge the superior claim of the government. Under such circumstances, as they have not co-

operated in the sale, they are not liable for any freight; not for a full freight, for the goods never were in a condition to be carried to St. Petersburg; and not for a pro rata freight, for the owners have not accepted them at an intermediate port, or dispensed with their farther carriage. We cannot presume, that they have derived any advantage from the sale here; and if they have, it cannot found a right to a pro rata freight, but was accidental, and without volition or election on their part. They were not bound to pay the duties out of other funds; and, indeed, it does not appear, that they had any other means on the spot to pay them.

In regard to the goods sold to pay the salvage, or moneys advanced to relieve the cargo from the salvage, they are to be treated exactly as if they had been lost on the voyage; for in the eye of the law it is a loss of them pro tanto, to the extent of the salvage; and therefore no freight whatsoever is due thereon. This doctrine was clearly settled in Luke v. Lyde, 2 Burrows, 882, where the owner had received his whole cargo, paying a moiety of their value as salvage; and Lord Mansfield expressly held, that, to the extent of that moiety, the cargo was to be considered as lost; so that half the goods were considered as lost, and half saved. Whatever may have been the doubts, entertained upon other points decided in that case, upon this point it has never been doubted or denied, at least to my knowledge. Lord Mansfield there took notice of a doctrine, not improper to be brought under review in the present case, that the salvors (in that case they were recaptors) are not bound to agree to a valuation, but might insist upon having the goods actually sold, if they had pleased, and taken their share of the produce of the sale, and thereby there would have been a total loss to that extent. What he thus states is ordinarily true; and probably is rarely or never departed from in the practice of courts of admiralty, unless by consent of the parties, where, from the circumstances of the case, the court clearly see that a proportion, and not a specific sum, ought to be allowed as salvage.

In regard to the claim for half profits, it is wholly inadmissible upon general principles. The half profits which were to be allowed, were the half profits upon a sale at St. Petersburg. The goods never have arrived there; and non constat, even independent of this calamity, that they ever could have arrived there, or when they had arrived there, if ever, what would have been the profits, if any. The whole claim, therefore, rests in mere possibilities and contingencies, which are incapable of being appreciated by a court of justice. The supreme court of the United States have on this account rejected the claim of profits, as an item of damages, even for a manifest tort committed on property, going on a foreign voyage, and intercepted by the wrongful act of the captors. The Amiable Nancy, 3 Wheat. [16 U. S.] 546, 560.

A suggestion has also been made at the argument, that if the petitioners have any claim to freight, the claim cannot be enforced by this court, because the lien for the freight has been displaced by the superior right of the salvors, and by the property having been transferred, by the possession of the marshal, to the custody of the court; and besides, as to Broughton's share, it has been transferred by the abandonment to the underwriters on freight. This last consideration is disposed of by the fact, that at the time, when the petition was entered, the underwriters on the freight had not accepted the abandonment. It was, therefore, rightfully filed to avail for the benefit of whom it might ultimately concern, like the claim of a trustee for his cestui que trust, or an assignor of a bond for the benefit of his assignee. The other grounds are equally untenable. The lien for freight, if any is due, is not displaced by the superior lien for salvage; but, subordinate to that, it has full validity and operation. The possession of the property by the court through its officers, is a possession protective of the interests of all concerned, and not displacing the rights or lien of any party. Nothing in point of jurisdiction is better founded, or in point of practice more extensively acted upon, than the rights of courts of admiralty to recognise and enforce all claims to freight, and, indeed, all other liens attached to property in their custody. In such cases the court considers itself as bound as matter of duty, to act in rem for the benefit of all concerned. See The Racehorse, 3 C. Rob. Adm. 101; The Martha, Id. 106, note; The Angerona, 1 Dod. 382.

The case, then, in the view, which I take of the matter, is reduced to the simple consideration, whether any freight is due upon the portion of the goods delivered to the underwriters, and on that which is still retained in the custody of the court, or on either. And let us first consider, whether full freight is due. The general principle of the maritime law certainly is, that the contract for the conveyance of merchandise on a voyage is in its nature an entire contract, and unless it be completely performed by the delivery of the goods at the place of destination, no freight whatsoever is due; for a partial conveyance is not within the terms or the intent of the contract; and unless it be completely performed by the delivery of the goods at the place of destination, no freight whatsoever is due, and the merchant may well say: "Non in haec faedera veni." For this proposition no authorities need in the present state of law be cited, for it is established, as well upon principle, as authority. In Lord Tenterden's Treatise on Shipping (Abb. Shipp., Am. Ed. 1829, pt. 3, c. 7, § 1, p. 273); and in Mr. Chancellor Kent's Commentaries (3 Kent, Comm., 3d Ed., lect. 47, pp. 227, 22:) it is laid down in broad terms; and in Caze v. Baltimore Ins.

Co., 7 Cranch [11 U. S.] 358. 362, the supreme court fully recognized it, saying: "Freight in general is not due, unless the voyage be performed." Such, then, being the general rule, and the voyage not having in the present case been performed by the transportation of the goods to St. Petersburg, it is certainly incumbent upon those who assert the claim, to show, that it falls within the spirit or sense of some exception. There are certainly exceptions to the general rule; but they all stand upon special and peculiar grounds. There are cases, where full freight is due, notwithstanding the goods have not arrived at the port of destination; and there are cases, where a pro rata freight is due, notwithstanding the like non-arrival. The latter will presently come under consideration. The former is properly before us in the view of the case, which I propose now to discuss. And I think the whole of the cases, in which the full freight is upon the ordinary principles of commercial law due, notwithstanding the non-arrival of the goods at the port of destination, may be reduced to the single statement, that the non-arrival has been occasioned by no default or inability of the carrier ship, but has been occasioned by the default or waiver of the merchant-shipper. In the former case, the merchant-shipper cannot avail himself of his own default to escape from the payment of freight; in the latter case he dispenses with the entire fulfilment of the original contract for his own interest and purposes. Thus, for example, if the goods be seized or detained at an intermediate port for the illegal conduct, or wrongful act, of the shipper, or if, at such intermediate port, he voluntarily insists upon receiving, and does receive his goods, the carrier ship being ready and able to carry them to their destination, there can be no doubt, that full freight is due for the whole voyage. I have said, that this is the result of the exceptions so far as they stand upon the ordinary principles of commercial law; and no case has been cited, where any of our courts of common law or equity have held any different doctrine. In the interpretation of commercial contracts, the decisions of these courts are entitled to the fullest consideration and weight; for, in general, they guide, although they do not always control, courts of admiralty in the exercise of their own judgment in the interpretation of such contracts. See The Louisa, 1 Dod. 317, 319; The Isabella Jacobina, 4 C. Rob. Adm. 77. I am aware, that in cases of prize and cases of capture and recapture, courts of admiralty have adopted some doctrines not seemingly in exact accordance with the doctrine above stated. But it is not safe or correct in many cases to reason from the peculiar doctrines arising out of the administration of international law and policy in courts of prize, to the ordinary exigencies of commerce, or the ordinary interpretation of common civil contracts. Courts of prize exercise a very peculiar and extensive

jurisdiction sui generis, upon very enlarged views, and a sort of international discretion, which do not belong to the common functions of other courts, or even of courts of admiralty in the exercise of their jurisdiction, as instance courts.

With these principles in view, let us consider the cases cited at the bar on the subject of full freight. The first is the case of the The Racehorse, 3 C. Rob. Adm. 101, where a British ship was freighted from Liverpool in ballast to St. Martin's and Lisbon, to bring a cargo of fruit to Ireland; and was taken on her return voyage by a French privateer off Falmouth, and afterwards recaptured and brought in to Falmouth. Upon the capture the master was taken out; and, owing to that fact, no claim was given into the court of admiralty for the cargo until the 17th of July, the ship having been restored by consent on the 2d of July; and restitution of the cargo was not decreed until the 16th of November. A claim was made for the full freight of the voyage, although the vessel refused to wait until the restitution of the cargo, the owner of the ship being dead, and his administrator declining to interfere. Lord Stowell (then Sir William Scott) allowed the full freight, upon the ground that the ship was not bound to wait. On that occasion he said: "Something is to be conceded by way of accommodation; a reasonable time is to be allowed; and, if it is not allowed, a proportion of the freight is to be deducted. But I cannot say, that a ship shall wait all this time for the mere chance of taking on the cargo, if eventually it shall be restored. It is said, that the contract was totally dissolved; but by whose means happened it that it was so dissolved? It was in no degree owing to the owner of the ship; but that the owner of the cargo was not ready to proceed. Though he acted as discharged from his contract, he is substantially entitled to the benefit of it. Upon these grounds, I am of opinion, that the ship is entitled to the whole freight." But he deducted therefrom the contributory share of the freight for the salvage on the recapture. Now, with all possible respect for this eminent judge, I cannot accede to the doctrine here promulgated, under any of its aspects, at least as applicable to ordinary cases of civil salvage. And I must also say, that the reasoning itself is not quite consistent throughout. In the first place, it is an inadmissible assumption, that the capture dissolved the contract of affreightment. At most, it only suspended it; and it reattached upon the recapture. Recapture confers a title to salvage only, and restores, and does not extinguish, the rights of neutrals, and, a fortiori, not the rights of fellow-subjects upon the admitted principles of the British laws. But if the contract were dissolved by the common calamity of capture and recapture, the voyage being unperformed, how does that give any rights to the ship-owner, beyond those of the owner of the cargo? This dissolution takes place, without

any default on either side. by mere operation of law; and then the parties, as it seems to me, are entitled to stand in pari jure upon their contract. If the whole voyage is not performed, the freight is not due. Lord Stowell himself admits, that the ship was bound to wait a reasonable time, after she was restored, or, otherwise, a pro rata freight only would be due. But, if the contract was positively dissolved, and the cargo was not ready to proceed, what ground is there to say, that the ship-owner, being discharged from his contract, is bound to wait an hour? His rights, if any, are complete at the time of the dissolution of the contract. Surely he is not bound to wait to fulfil a duty, from which he is discharged. And, indeed, it does not strike me, that there is the least difference, upon the principle stated by his lordship, whether the cargo was ready to proceed or not. If the ship was ready, and the contract was dissolved, upon what grounds can the master be required to do an act, from which, as a matter of contract, he is released? In the case of The Martha, 3 C. Rob. Adm. 106, note, the same learned judge granted full freight under the following circumstances. An American ship, bound from America to Amsterdam, was captured in the Channel by a British cruiser, and brought in on the 20th of December, 1800; and the ship was restored on the 10th of January, 1801. On the 15th of January, a commission of unlivery passed; and on the 16th, one fourth of the goods composing the cargo was restored. It being necessary, in order to get at these goods, to unliver the rest of the cargo, the whole was accordingly unlivered. The claimant of the goods insisted on the ship's taking them on board again, offering to be at the expense of the reshipment, and to have them carried on to their destination upon the original freight. This was refused by the master; and the question was, whether he was entitled to full freight on these goods or not. Lord Stowell gave the full freight upon the mere dry authority of a decison of Sir James Marriott, which he thought himself bound to follow. For myself, I feel bound to say, that I should have been better pleased if the learned judge had applied his great mind to examine the case upon principle, and instructed us as to the grounds upon which such a doctrine is maintainable. I am unable to perceive any, either of law, or of reason, or even of common justice. Then came the case of The Hoffnung, 6 C. Rob. Adm. 231, before the same learned judge. It was the case of a capture of a neutral ship and cargo in August, 1805, made by a British cruiser. On the 1st of September, a decree of restitution of the ship was passed, and a commission of unlivery of the cargo was on the same day taken out by the captors, and the unlivery was completed on the 20th of September. Notice was given to the master before the unlivery of the whole of the cargo, that he would be required to carry it on the voyage. The claim for the cargo was

given in on the 24th of September, and on the 28th of the same month the cargo was restored. The master was then required to take it on board again; but he refused, and made a claim for full freight. Lord Stowell, upon the footing of the case of The Martha, already cited, held the ship entitled to full freight, and said; "The contract between them (the parties) ceased by the act of unlading. At the moment of separation the vessel acquires a right to proceed; and it is by accident only, that she continues here. That accident cannot, I think, have the effect of reviving the contract, which had been before dissolved." To this case, as to the former, the same substantial objection applies. The capture of a neutral ship has never been admitted by the courts of the United States to operate a dissolution of the contract of affreightment. At most it only suspends it; and when restitution takes place, the parties are also restored to their antecedent rights. The vis major having ceased, the jus postliminii operates upon the case. In my humble judgment, it would be a most mischievous doctrine to the great interests of commerce and navigation, that a mere unlivery of cargo by superior force, or by the order of a court of prize, should operate to dissolve a contract made between mere neutrals. How is it in relation to other cases, arising in the common course of navigation? Suppose a ship meets with a calamity in the course of a voyage, and is compelled to put into a port to repair, and there the cargo is required to be unlivered, in order to make the repairs, or to insure its safety, or ascertain and repair the damage done to it; would such an unlivery dissolve the contract for the voyage? Certainly not. And if the contract is dissolved, by operation of law, how happens it, that the ship-owner can entitle himself to assert a right to freight, when he has not performed the voyage; and the owner of the cargo, who has been in no default, and is prevented by the peril or the loss, or by an unlawful capture, from receiving it, is to be treated, as if he had violated his contract? If dissolved, it seems to me, that the contract must be treated, as dissolved by an overwhelming calamity, which absolves both parties from all obligations under it. Neither party has contracted with reference to such a state of circumstances; and the law would seem to be manifestly unjust, if, in such a case, it threw the whole burthen on one side. The case of The Angerona, 1 Dod. 382, on the instance side of the court, requires but a single remark. The full freight was there given, avowedly upon the ground, that the owner of the cargo was in default, and that the sale of a part of the cargo at an intermediate port, for which freight was demanded, was occasioned by that default. Whether the facts of the case, which are very imperfectly stated, justified that conclusion or not, it is not for this court to say. But the decision proceeds upon a very clear principle of law, that the

whole freight is due, if the whole would have been earned but for the default of the owner of the cargo. In the case of The Isabella Jacobina, 4 C. Rob. Adm. 77, an application was made, on the part of a Swedish ship, for freight under a charter-party to go from Plymouth to Radstow, there to take in a cargo of pilchards for Venice. The ship had sailed to Radstow, and taken in her cargo there, and had proceeded a few days on her voyage, when she met with bad weather, and returned to Falmouth. A few days afterwards an embargo was laid on Swedish vessels; the cargo was unloaded, and restored to the owners, who were British merchants. Lord Stowell held, that no freight whatever was due, upon the ground, that the ship had performed but a small part of her voyage, and the Swedish embargo having taken place, it rendered the fulfilment of the contract impossible. The cargo could not wait till the embargo might be taken off, and, being British property, it was restored. Now, this case seems to proceed upon true principles. As an unlivery of the cargo had taken place under the authority of the British government, it seems not distinguishable from the cases already cited, except that the ship was not ready to go on, but the cargo was. If the contract was dissolved by the embargo and unlivery, which was of a hostile nature, there might have been room for the suggestion, that the rights of the ship-owner ought not to be affected thereby. In truth, however, if so dissolved, without any default on either side, the true doctrine applicable to such a case would seem to be, that neither party could claim any thing under the contract of affreightment. The case of The Louisa, 1 Dod. 317, approaches somewhat nearer to the present. There, the ship and cargo, bound on a voyage from Quebec to the island of Madeira, was captured in December, 1812, by an American privateer, and recaptured on the 11th of January, 1813, by a British ship of war. At the time of the recapture, the ship was in a distressed state, having had some of her masts carried away in a gale. A prize-master was put on board with orders to proceed to the first port in England; but the ship having twenty-four feet of water in the hold, and the crew being exhausted, it was found impossible to proceed to England; and the ship put into Corunna, where the cargo was disposed of under the authority of the British consul. On a suit for civil salvage in addition to military salvage for the recapture, the court sustained the claim for both; and a claim was made for freight. Lord Stowell refused the claim saying; "With respect to freight I am of opinion, as well upon the equity of the case as upon the authority, which has been cited (Hunter v. Prinsep, 10 East, 378), that none is due, the voyage having been totally defeated by the sale of the goods at Corunna." That is precisely in coincidence with the doctrine, which I have already had occasion to assert in the present

opinion. See, also, The Wilelmina Elenora, 3 C. Rob. Adm. 234.

The cases in the admiralty, therefore, do not, in my judgment, in any manner shake the proper doctrine, which is deducible from the common law authorities upon the subject of freight in ordinary commercial adventures. Then, do the circumstances of the present case furnish any distinct ground for the claim of a full freight? It has been suggested, that the owners of the cargo have been guilty of some default in not obtaining a delivery of the cargo at an earlier period, when the ship was restored and repaired, and ready to receive it. It has been said, in reply, that there was no default on any side; but if there was any, it certainly was a prior default of the master and crew of the ship in deserting her, when she struck on the South Shoal, and leaving her to float off as a derelict; and that all the subsequent detention and loss have arisen from that cause. My opinion is, that there has been no default on either side. The striking on the shoal was a peril of the sea, and the desertion of the ship was an act justified by the necessities of the case. I agree, that the subsequent occupation of the ship by the salvors was a common and most valuable service consequent upon the abandonment of her; and that all the detention has arisen from that source. Still, it is but an incident to a common calamity. It is said, that the ship being ready on the 30th of July to receive the cargo, and due notice being given thereof, she was entitled to her full freight, because the cargo was not then ready to go on the voyage. That it was not ready, is admitted. But was this owing to any default of the owners, or was it a natural, if not a necessary, consequence of the common calamity? My opinion is, that it was the latter. What were the circumstances of the case at that time? The owners of the cargo were not upon the spot; but resided in a distant country. The Messrs. Holford and Company had no agent here, authorized to act for them, and to stipulate for their part of the goods on bail, if a delivery could have been obtained of them from the court. In cases of salvage, I do not know, that the owners of either ship or cargo have, as a matter of right, any claim to have either of them delivered on bail at an appraisement. If either of them be perishable, or may sustain injury from the delay of the salvage proceedings, a sale may be, and usually is, authorized by the court. But, unless the salvors assent to a delivery on bail, it is not the usual practice of the court to direct a delivery on appraisement. The salvors have quite as strong a right to insist upon having their claims fixed by a sale. And where the court clearly sees from the nature of the case, that the salvage ought to be, not a gross sum, but a proportion, I think it would be difficult to find any duty of the court to deliver on an appraisement. At least such a case would present a ground

for the exercise of sound discretion on the part of the court in refusing it. But here the owners were not only not upon the spot, but one-third of the cargo was abandoned by the agent of Messrs. Cramer to the underwriters on that part of the cargo on the 10th of July, long before the ship was repaired. The agents, therefore, could take no steps for the delivery on bail. The underwriters, if any persons, were bound to make the application. They did make it on the 2d of November, and with the consent of the salvors obtained a delivery on bail of the remaining sugars abandoned to them. But it was certainly then too late to carry them on to St. Petersburg that season. It is said, that they could by an application at an earlier period have obtained a delivery in time to have been sent on that season. I do not know, that there is any proof of that; and if there were, it would still remain to inquire, whether there was any duty on their part to submit to an appraisement and delivery on stipulation. My opinion is, that there was no such duty. It was an affair of discretion to be exercised by them or not at their own pleasure. They were in no default; for the property being brought into a court of admiralty by a claim of salvage, they had a right to wait the regular course of proceedings on such a claim, without being treated as wrong doers or defaulters. If the master and owner of the ship were so solicitous to proceed at once on the voyage, why did they not offer to procure such delivery on bail, and become themselves the stipulators for the underwriters?

But what is most material in this posture of the case, is, that in the intermediate time, between the 30th of July, when the notice was given, and the 2d of November, when the delivery was obtained, the owners of the ship had, in fact, sold her; one half on the 7th September, and the other half on the 26th of September. Now, this sale, in my judgment, was a complete discontinuance of the offer, admitting it to be a continuing offer up to that time, to receive the cargo on board, and carry it to St. Petersburg. They had then parted with their power and control over the ship; and they had no right to substitute any other ship or vehicle of conveyance in her stead. It was not a change of ship required or justified by necessity; but it was a sale from choice. So that it seems to me, that the sale of the ship was a withdrawal of the offer to carry the cargo to St. Petersburg, on the part of the owners of the ship; and the obtaining of the one third from the custody of the court on stipulation, without any notice or request to carry on that part of the cargo to St. Petersburg, was a voluntary acceptance thereof by the underwriters at Boston. and a dispensation of the ship-owners from the duty of carrying them farther. In respect to the other part of the cargo belonging to Messrs. Holford and Company, there was, as has been stated. no agent here, who was authorized to require a delivery of them from the court; and certainly there was no duty on any party to require it; or if there was any such duty, it was a duty falling on the master of the ship. These goods still remain in the custody of the court. They have never been delivered to any party, and the court has refused to deliver them. But Messrs. Bates and Company, as agents of Messrs. Holford and Company, in February, 1839, gave notice to the ship-owners, that they wished them carried on to St. Petersburg; and the latter then declined to do so. From this period, therefore, there was a relinquishment of all attempts on either side to enforce a strict performance of the original contract. My opinion, upon these circumstances, is, that no claim is made out in law, or in equity, or in general justice, for a full freight. I think, that no party has been in default; and each has stood upon his rights, and has awaited, and had a right to await, the regular determination of the admiralty proceedings. If the ship-owners would have earned their entire freight, they were bound to perform their whole contract. The progress of the voyage was interrupted by a common calamity; and hitherto there has been no opportunity for the ship and cargo to resume the voyage, as the admiralty proceedings have not yet terminated. "Adhuc sub judice lis est." If the ship owners would have entitled themselves to an entire freight on the property saved from the salvage, and capable of being carried on, they should have waited, until the whole adventure could be resumed; and then have required the owners of the cargo to allow them to carry it forward, when it was released from the admiralty proceedings. They have elected a different course; and they are, in my judgment, bound by their election. They ask the court to give them full freight, although it has not been earned by a completion of the voyage, and although the other side has been guilty of no default, and has not freed them from the obligation. They sold their ship within a sort period after she was repaired for the voyage; and yet they ask a compensation, as if they had borne all the expenses, and burthens and perils of the subsequent part of the voyage. I repeat it, I can find no law. or equity, or justice, in such a claim, and therefore I do not hesitate to reject it.

The next question is, whether there is any just claim to a pro rata freight. I think there is. Taking all the circumstances together, I think the farther prosecution of the voyage has been abandoned or waived by both parties. The ship-owners have sold their ship, and can no longer complete it. The underwriters on the one third of the cargo have not asked to have the voyage prosecuted. The owners of the other two thirds have asked it; but under circumstances in which it became impossible for them to ship it. The parties have, therefore, withdrawn from the contest, without having

been able to prosecute the voyage, or effectually to seek its prosecution beyond the port of Boston. The just operation of law upon this state of things, in my judgment, is that which I have indicated. The owners of the cargo are content to take their goods here, and the ship-owners to leave them here. It is, if I may so say, a reluctant acquiescence forced upon them by an overruling necessity. I shall, therefore, decree a pro rata freight, leaving the amount to be ascertained by the auditor to be appointed by the court, according to the agreement of the parties. There is another point suggested at the argument, and that is, whether the freight pro rata ought to contribute either to the general average, or to the salvage, or to both. My opinion is, that it ought to contribute to both. To the general average, because it is one of the interests saved by the jettison; to the salvage, because it is an expense incurred, like the general average, for the benefit of all concerned. [2]

After the delivery of the foregoing opinion, another question was presented to the court. One of the salvor vessels was the brig Olive Chamberlain, of which Samuel C. Hunt was owner, and Zacheus Holmes was master. Salvage was awarded to the master and owner of the brig by the decree; and now a claim was interposed by John Dyer for a moiety of the salvage decreed to Hunt, upon the ground, that he was joint-owner of the brig with Hunt for the voyage, under a charter-party executed by Hunt on the one part, and Hunt and Dyer on the other part. He also claimed salvage as joint-owner of the cargo for the voyage with Hunt.

The charter-party was in substance as follows:

"This charter-party, made and concluded upon in the city of Boston, the twenty-fifth day of April, in the year one thousand eight hundred and thirty-eight, between Samuel C. Hunt, owner of the brig Olive Chamberlain, of Boston, of the burthen of two hundred and six tons, or thereabouts, register measurement, now lying in the harbor of Boston, of the first part, and John Dyer and Samuel C. Hunt of the second part, witnesseth, that the said party of the first part, for and in ·consideration of the covenants and agreements hereinafter mentioned, to be kept and performed by the said party of the second part, doth covenant and agree on the freighting and chartering of the said vessel unto the said party of the second part, for a voyage from Boston to the Havana, in the island of Cuba, and back to Boston, on the terms as following, that is to say: First.— The said party of the first part doth engage, that the said vessel in and during the said

voyage shall be kept tight, stanch, well fitted, tackled, and provided with every requisite, and with men and provisions necessary for such voyage. Second.—The said party of the first part doth further engage, that the whole of said vessel, (with the exception of the cabin, and the necessary room for the accommodation of the crew, and the stowage of the sails, cables and provisions), shall be at the sole use and disposal of the said party of the second part during the voyage aforesaid; and that no goods or merchandise whatever shall be laden on board, otherwise than from the said party of the second part, or their agent, without their consent. on pain of forfeiture of the amount of freight agreed upon for the same. Third.—The said party of the first part doth further engage to take and receive on board the said vessel during the aforesaid voyage, all such lawful goods and merchandize as the said party of the second part, or their agents, may think proper to ship.

"And the said party of the second part, for and in consideration of the covenants and agreements to be kept and performed by the said party of the first part, doth covenant and agree, with the said party of the first part, to charter and hire the said vessel as aforesaid, on the terms following, that is to say: First.—The said party of the second part doth engage to provide and furnish to the said vessel, cargoes or ballast sufficient to proceed to sea. Second.—The said party of the second part doth further engage to pay to the said party of the first part or his agent for the charter or freight of the said vessel during the voyage aforesaid, in manner following. that is to say: fifteen hundred dollars for the voyage out and home, one half to be considered as earned on arrival in Havana; together with all foreign port charges and pilotage. The remaining half to be earned on delivery of a cargo in the United States; the whole payable in Boston, the port charges in the island of Cuba to be paid there free of commission. ·

"It is further agreed between the parties to this instrument. that the said party of the second part shall be allowed, for the loading and discharging of the vessel at the respective ports aforesaid, lay days as follows, that is to say: twenty-five running lay days from her entry in Havana, and in case the vessel is longer detained, the said party of the second part agrees to pay to the said party of the first part, demurrage at the rate of twenty Spanish milled dollars per day, for every day so detained, provided such detention shall happen by default of the said party of the second part, or his agent. It is also further understood and agreed, that the cargo or cargoes shall be received and delivered alongside of the vessel within reach of her tackles, or according to the custom and usages at the ports of loading and discharging. It is also further understood and agreed, that this charter shall commence-

[2] See Mr. Phillip's edition of Stevens & Benecke on Average (page 220, notes a. 1); The Dorothy Foster, 6 C. Rob. Adm. 88; The Progress, Edw. Adm. 210; The Racehorse, 3 C. Rob. Adm. 101.

when the vessel is ready to receive cargo at her place of loading, and notice thereof is given to the party of the second part, or his agent. It is further understood and agreed that the party of the second part may send the brig to one or more ports in the island of Cuba, by paying demurrage as aforesaid from and after the twenty-five lay days aforesaid have expired; and should the brig proceed to a southern port of discharge the vessel will receive demurrage from the delivery of her cargo at a southern port until her final discharge in Boston. Should the brig take freight to Europe according to instructions this charter-party to be considered null and void."

["To the true performance of all and every of the foregoing covenants and agreements, the said parties each to the other, do hereby bind themselves, their heirs, executors administrators and assigns, (especially the said party of the first part the said vessel, her freight, tackle, and appurtenances; and the said party of the second part the merchandise to be laden on board,) each to the other, in the penal sum of fifteen hundred dollars.

["In witness whereof, the said parties have hereunto interchangeably set their hands and seals, the day and year first above written.                    Samuel C. Hunt.
                          [John Dyer."] [3]

The master's deposition was taken and used in the cause. From that deposition it appeared, that he commanded the brig on the voyage from Boston to the Havana and back again in the summer of 1838, on which the salvage was earned, by bringing the ship Nathaniel Hooper, which was found derelict at sea, into the port of Boston. He sailed the brig under a verbal contract with Hunt, similar to a contract reduced to writing, which had been made between him and Hunt in the next preceding voyage, and of which he annexed a copy as follows—"Boston, January 10, 1838. It is agreed between S. C. Hunt, and Zacheus Holmes, that the said Zacheus Holmes shall receive from S. C. Hunt the sum of seven hundred and fifty dollars, being one half the charter for said brig for a voyage from Boston to the Havana and back, with the demurrage for sailing, victualling and manning the brig Olive Chamberlain, together with half cabin freight and all passage money, after deducting half port charges in Boston, as is customary. (Signed) Samuel C. Hunt."

He also received orders for the voyage signed by Hunt and Dyer as follows: "Charlestown, April 24, 1838. Capt. Zacheus Holmes. Sir,—You being master of the brig Olive Chamberlain, now loaded for Havana in Cuba, we wish you, on your arrival at that place, to advise with John Morland, Esq. as to the state of that market. We also wish you to dispose of our shipment

to the best advantage; first obtaining the assistance of Mr. Morland, if his services can be had to our interests. We further wish you to obtain a cargo of molasses on the account of us or the brig, provided you can, without paying more than 3½ rials for a good sweet article. In case you do not get a cargo, as aforesaid, you are at liberty to take freight for the United States. We also give you further liberty to draw on us at sixty days for an amount sufficient to pay the balance which you may need for a cargo of molasses, after paying in the net proceeds of your outward cargo. In such case, you will sign your bills of lading in favor of Samuel C. Hunt, and draw on the same, which draft we both agree to protect. You will please be particular in stowing your cargo, and have it well fastened under deck. In case of no cargo or freight to the United States, you are at liberty to take freight to Europe, providing one offers at a high rate. We also give you liberty to go to Mariel or other places of about equal distance, if for our interests. Wish for you to advise us of your doings as often as convenient. Sam'l C. Hunt. John Dyer."

The brig went on the voyage, and took on board, at Havana, a return cargo for Boston on the joint account of Hunt and Dyer; and the salvage was earned on the return voyage. The master also testified, that his contract to sail and victual and man the brig was wholly with Hunt, and he looked to him alone for pay; and that he acted for Hunt and Dyer only as to the cargo. The return cargo was purchased with funds sent out on the outward voyage.

[3][Upon this state of facts, Betton, of counsel for Dyer, made two points: (1) That Dyer was, under the charter party, joint owner of the brig for the voyage, and entitled to share in the salvage; (2) if not, that he was joint owner of the cargo and was entitled to salvage for that in common with Hunt.

[Betton in support of his points argued as follows: In April, 1838, Samuel C. Hunt was the owner of the brig Olive Chamberlain, of the value of $8,000. Zacheus Holmes was a master mariner, who had sailed her on some occasion previous, at half profits, he victualling and manning. John Dyer was a capitalist, and willing to furnish means to any enterprise, which might aid his neighbors and benefit himself. A voyage was concerted among these three persons and is evidenced by the charter party, the joint letter of instructions, and the deposition of Capt. Holmes. Holmes swears that he made the bargain with Hunt in the presence of Dyer, as to the sum for which he would victual, man and sail her, which was the sum of one half the charter $750, and one half the demurrage. Hunt and Dyer, by the charter party, were to furnish a cargo or ballast to

go to sea. The brig, by the letter of instructions of Hunt and Dyer, was to go to Havana, &c., for a cargo, and Captain Holmes, as agent for Hunt and Dyer, was directed to purchase a cargo of molasses, if he could purchase at a certain rate, and to pay for the same in part by the articles sent out by them, as cargo, and in part by bills, which Hunt and Dyer by the aforesaid letter agreed to meet. If he could not purchase a cargo of molasses, then by the charter party and instructions, the captain was to take a freight for the United States. If these both failed, he was at liberty to take a freight for Europe.

[Here were joint orders, in relation to the employment of the brig, the purchase of the cargo and the obtaining of freight, dated April 24, 1838. Another paper was drawn up, called a "charter party," dated April 25, 1838, in which Hunt agrees to become joint charterer with Dyer, and they are to pay for the brig victualled and manned and sailed, for the voyage or voyages, to Havana, &c. and back to the United States, cargo or no cargo, freight or no freight, fifteen hundred dollars; one half of which sum is for the use of the brig; the other half for the victualling, manning and sailing, that is, Hunt was to furnish the brig for $750, and Dyer was to pay for the victualling, manning and sailing, $750. The foreign port charges and demurrage were to be shared equally. The profits of the expedition were to be upon the cargo, or freights obtained, and to be shared equally by the charter party. Hunt and Dyer were, by this agreement, called a "charter party," to have the whole use, benefit and profit of the brig, so far as it could be appropriated to cargo or freight.

[Captain Holmes obtained—

| | | |
|---|---|---|
| 35,850 gallons molasses, value at 32 cts. | $12,472 | 00 |
| 1 Box Sugar 426 lbs. at 13 | 55 | 38 |
| 36,500 Segars, on freight, supposed to be worth 16,— | 584 | 38 |
| | $13,111 | 76 |

—as stated by Mr. Hunt, and admitted to be correct by Dyer. The molasses and sugar for account of Hunt and Dyer as purchasers, and the segars on freight. Here was a joint undertaking of mercantile adventure by Hunt and Dyer. The vessel was put into common stock, at $750, for the use, and Dyer was to pay for victualling, manning and sailing, $750, and demurrage and port charges to be paid equally. He was to sail on joint account, in their joint employ.

[I submit that the joint letter was the appointment of the captain, who was to victual, man and sail for a round sum, to wit, $750, being one-half the charter, and demurrage, as he states in his deposition. It also makes him supercargo. I submit, then, that the reasonable construction of all the evidence, taken together, is, that Hunt and Dyer were owners for the voyage. That Hunt divested himself of the character, and responsibility of owner and stands in the character and with the responsibility of joint charterer of the vessel, as he is joint owner of the cargo, with Dyer. Holmes was in by special contract, and not as the servant or agent of the owner of the vessel as such—as appears by his deposition—and could not be removed by Hunt.][3]

In the case of Hooe v. Groverman, 1 Cranch [5 U. S.] 214, the question turned upon the fact, as to the ownership for the time being, that the vessel itself was not let, but only the tonnage. In the present case, there was a letting of the vessel itself by Hunt, or an agreement, that he and Dyer would have the whole use for all beneficial purposes, and Holmes was let in under a special contract; Hunt thereby divesting himself of the character of owner, and assuming the character of joint charterer. Hunt is not in possession as owner. The distinction between letting the vessel and taking the freight will be found in Abb. Shipp. 253; in Coggs v. Bernard, 2 Ld. Raym. 909; and in Cushing's Poth. Cont. art. 1, § 25, pp. 14–16. Lex Mercatoria Americana, 103, remarks on the case of Parish v. Crawford, 2 Strange, 1251. The general rule is, that in a freighting ship, that is, where freight is taken by the ton, or by measurement, or by the piece, the owners of the freight, as such, are not entitled to salvage. One reason is, the owner of the vessel is in possession as owner, with all the responsibilities of owner, and the captain is his servant, put in by him, and liable at any moment to be dismissed by him, and the owner is liable for any deviation or other misconduct of the captain. But such was not the case here. Another reason is, that it might bring, unnecessarily, too many parties before the court. But the court say, that this rule is not absolute, but is in the discretion of the court. In Bond v. The Cora [Case No. 1,621], and here, Hunt and Dyer claim in the libel salvage, as joint charterers of the Olive Chamberlain and joint owners of the cargo. Here, the owner of the vessel would not be liable for supplies furnished the vessel, according to Holmes' deposition and the other papers. Cutler v. Winsor, 6 Pick. 335; Thompson v. Hamilton, 12 Pick. 425. And as to freight taken, there was no privity of contract between Hunt, as owner, and the shippers. The contract was between Hunt and Dyer, as charterers, owners, pro hac vice, by Captain Holmes, their agent and supercargo, and the shippers. James v. Jones, 3 Esp. 27; Abb. Shipp. 27, 28; Jac. Sea Laws, 213, 214. Hunt, therefore, was not in possession as owner; was not liable for supplies as owner, and was not responsible, at least to Dyer, for the misconduct of the captain, as owner. If, then, upon the evidence of the agreement, called a charter-party, and the

---

[3] [From 2 Law Rep. 165.]

joint letter of instructions, and Captain Holmes' deposition, Hunt has divested himself of the character and responsibilities of owner, as it respects Dyer, and stands only as joint charterer, the salvage, awarded to the owners of the Olive Chamberlain and cargo, is to be equally divided between Hunt and Dyer.

2d. But if the court should be of the opinion, that, upon the legal construction of the evidence, Hunt remained owner of the vessel, pro hac vice, then the share of the brig, or the ratio which the value of the brig bears to the value of the brig and cargo, will belong exclusively to Hunt. And the next question is, to whom the salvage allowed for the value of the cargo will belong. Of the cargo, Hunt and Dyer are stated in the libel to be joint owners (and this is proved by Holmes), except the cigars, which they carried on freight. Salvage is allowed to the property put at risk. The court never allow the captain salvage for property by him put at risk. They do not allow him to become insurer. They do not encourage him to jeopard his owner's cargo and go a wrecking. His deposition is not evidence for himself, but only between Hunt and Dyer. He is allowed something for personal services, &c. Those positions are so universal in the books, as to need no citation of cases. Here the property was put in imminent hazard. The brig was leaky, and was left very short-handed. It appears by the letter of instructions, and the deposition of Captain Holmes, that in everything relating to cargo and freight he was agent of the charterers, Hunt and Dyer. In navigating, &c., he was his own agent under his contract. In committing the deviation, and saving the Nathaniel Hooper and cargo, and jeoparding the cargo of the Olive Chamberlain, he acted as agent of Hunt and Dyer; and Hunt would not be liable in case of loss, as owner, to Dyer. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. Holmes held the capacity of supercargo. For his powers, we cite Lawes, Chart. Part. 78, 319; Oliver, Law Summary, 321–343; and the case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 248. The case of The Blaireau goes farther. Salvage was there given to one of the owners of the cargo, because his partner was on board the saving vessel, and assented, or was presumed to have assented to the attempt at salvage, and had thereby discharged the owner of the vessel from liability in case of loss. Now, a partner in a mercantile adventure could not as general copartner, bind his partner in a wrecking adventure without his knowledge and consent, it not being within the scope of the copartnership business; but yet the absent partner, as well as the present one, drew salvage in proportion to the value of his interest in the cargo.

In the case of The Jefferson in New York, cited by Judge Washington in Bond v. The Cora [Case No. 1,621], the owner of the ship was part owner of the cargo, and the captain was owner of the remainder of the cargo. The salvage was distributed in proportion to the value of the property put at risk. Hunt by his several contracts with Dyer and with Holmes took care to divest himself of the liabilities of owner, and why should he claim the exclusive right to the advantages, profits and Godsends of the voyage? Dyer, then, is entitled, if not to half the salvage awarded to the owners of the Olive Chamberlain and cargo, certainly to the ratio of half the value of the cargo, to the value of the brig and cargo.

[Mr. Choate, for Hunt, argued e contra, as follows:

[The question here is as to the right of Dyer to a part of the salvage awarded to the brig Olive Chamberlain, her owners, officers and crew. The facts, upon which it is to be determined, are supplied by the evidence introduced by Dyer, that is to say, the instrument called a charter-party—the letter of instructions, and the deposition of Holmes taken and offered by Dyer. The circumstance that Dyer unites in the libel with the others, is by express agreement, to benefit or prejudice nobody. He claimed—and to avoid expense—he was united in the libel, without prejudice.][3]

We resist the application of Dyer, on the general ground, that, upon the proofs supplied and relied on by him, he is, in point of law, a mere shipper of goods, on board a vessel navigated by Hunt's agent, for whose acts, in the course of navigation, Hunt is responsible to Dyer. In cases, where a party ships goods in another's vessel, and has a claim upon the owner, for the deviation of the captain, if injured by it, he is not entitled to salvage. This never was doubted. Bond v. The Cora [Case No. 1,621]; also, Taylor v. The Cato [Id. 13,786]. The sole question is, therefore, whether, in this case, the captain was so far the agent of Dyer, that Dyer could not claim of Hunt for the deviation of the captain. The general rule, or prevailing practice in the admiralty, seems to have been to hold, as between owners of ships, and those who take them for freight or charter, that the latter are not entitled to salvage. So expressly declared in Taylor v. The Cato, ubi supra. An inspection of what is called the charter-party, in this case, conclusively evinces, that according to settled distinctions upon the subject, Dyer is not owner of the vessel, nor joint owner pro hac vice, and that the captain, in the specific matter of navigating the vessel, is not his agent,—but the general owner's. The general owner, Hunt, is to transport the cargo by his own men, hired, paid, and provisioned by himself. For this, he is to be compensated by the freight, or in freight. In so far as the sale of outward, or purchase of homeward cargo is concerned, he

---

3 [From 2 Law Rep. 165.]

and Dyer are jointly interested. But the matter of transportation and navigation is wholly Hunt's. He furnishes a vessel, keeps her in repair, hires her officers and men, may hire any captain he pleases, and any crew, and pays and provisions them. It is plain, that, on this contract, Hunt is required to hire no particular individual. He may put any body on board, and Dyer cannot interpose.

[If so, Hunt assumes the responsibleness of their behavior.

[The claimant, Dyer, puts in Holmes' deposition, but it is decisive against him. He proves, that so far as navigating the ship is concerned, Holmes is Hunt's sole agent, and that he acts for Dyer also, only in port, in procuring and disposing of cargo. Just so, it may be in the commonest case of a shipment of the smallest quantity of goods in a general ship. There the captain is the agent of the shipper, or may be so, and his agent only, or may be so, in disposing of the adventure. In sailing the ship, he is not. Holmes swears, that Hunt alone contracted with him. He contracted with him, for himself, not for himself and Dyer. He looked to Hunt only for his pay. He sailed the ship for him. It is impossible to maintain, that in the deposition, there is anything to control unfavorably to Hunt, the effect of the charter party. The letter of instructions proves that Dyer does not intermeddle with the sailing of the ship. This is not the appointment of the captain. This is not a contract of hiring the captain. That appointment was made by another contract between Hunt and Holmes, and that fixed the rule and mode of Holmes' compensation. But this letter is addressed to Holmes, only, in his capacity of an agent to dispose of or buy a cargo. It presupposes him captain, by another bargain. It says nothing of his manner of performing the voyage. It does not even admonish him to make dispatch. It begins with him on his arrival.][3]

A comparison of the charter party and the proofs with Marcardier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 39; McIntyre v. Bowne, 1 Johns. 229; Hallet v. Columbian Ins. Co.. 8 Johns. 272; Cheriot v. Barker, 2 Johns. 346; Fletcher v. Braddick, 2 Bos. & P. [N. S.] 182; The Volunteer [Case No. 16,-991]; and Certain Logs of Mahogany [Id. 2.559],—seems to leave no doubt, that the general owner remains the owner for the voyage; that the captain is his agent, and that he is responsible for his acts.

[The charter party in Marcardier v. Chesapeake Ins. Co., ut supra, is exactly this charter party. I forbear to comment on that or the other cases. There really seems to be no room for a question. It is said that Hunt, by his contract with Holmes, relieves himself from his responsibilities as

owner for this voyage; and the case in 6 Pick. 335, is cited. The truth is that this arrangement between Hunt and Holmes does not, in the slightest degree, affect Dyer's right, on the charter party, to treat Holmes as Hunt's agent. By that instrument, Hunt is to sail the ship. He is to man her. Whomsoever he may put on board, and by whatever contract, as between Dyer and Hunt, they are Hunt's agents when on board. From this responsibility and this relation, Hunt cannot exempt himself, by any species of contract with the men whom he hired.][3]

Even as between Hunt and Holmes, Holmes is not so far owner as to exempt Hunt from responsibleness for his acts, or from his general responsibleness as owner. The case, between those parties, is no more than this; Hunt has made a contract of affeightment with Dyer, by which he is to man, provision, and sail a vessel, on a given voyage, for a given freight. He then hires Holmes for that specific adventure, and agrees to pay him a specific sum for supplying the men and provisions, and taking command. This contract is made subsequently to the charter-party, and the operation is to leave Hunt in possession, and navigating his own vessel by a master hired for the specific enterprise. As to the world, but certainly as to Dyer, Hunt remains the owner, acting by an agent.

STORY, Circuit Justice. The first question, which arises, is, who was owner for the voyage? It has been suggested, that, perhaps, Holmes might, under the special agreement, be deemed owner for the voyage, upon the authority of Cutler v. Winsor, 6 Pick. 335, and Thompson v. Hamilton, 12 Pick. 425, although the point was rather hinted at, than made. Without meaning in the slightest degree to doubt or impugn the decision in these cases, I think, that I may say, that they go to the very verge of the law on this subject. Perhaps they will be found not easily reconcilable with some of the English authorities, where a sharing in the profits, or in the net earnings of the vessel, has been thought to make the voyage a partnership adventure, and the master and owner of the ship to be joint owners thereof for the voyage. See Dry v. Boswell, 1 Camp. 329. But the present case is clearly distinguishable from those cases, as the owner contracted to pay the master a specific sum for the voyage, for sailing, victualling, and manning the brig, with demurrage, and half cabin freight, &c., subject to certain deductions. It was, therefore, a mere mode of compensation of the master, like a contract for a share of the gross earnings of the voyage, the owner retaining the sole control and direction of the voyage for his own purposes. The point, however, is not material to the decision of the claim of Dyer; for, whether the master, or Hunt, were

---

[3] [From 2 Law Rep. 165.]                [3] [From 2 Law Rep. 165.]

owner for the voyage, unless he, Dyer, was also owner, he could not participate in the salvage awarded to the brig.

The question then arises directly in judgment, whether Dyer was a part owner of the brig for the voyage under the charter-party. It appears to me, clearly, that he was not. In whatever light that instrument is viewed, it is but a contract for freighting and chartering the brig for the voyage to Havana and back again to Boston, to carry cargoes for the joint account of Hunt and Dyer. Hunt was to equip, man, and provision the vessel for the voyage; and the whole of the vessel was not let for the voyage; but the whole, with the exception of the cabin and necessary accommodations for the crew and the stowage of the sails, cables, and provisions, was to be "at the sole use and disposal" of Hunt and Dyer jointly; and Hunt engaged to take and receive on board all lawful goods which Hunt and Dyer, or their agents, should think proper to ship. Hunt and Dyer covenant (and although at law, the covenant, being with Hunt, would be incapable of being enforced, yet in a court of equity it would be held valid and binding), to furnish cargoes, and to pay fifteen hundred· dollars for the voyage out and home, with the port charges and pilotage. It seems to me, that the whole structure of the charter-party manifestly contemplates, that, as between Hunt and Dyer, Hunt is to remain sole owner for the voyage, and that all his covenants require that he should be so treated. He is to appoint and pay the master and crew, and provision the vessel; he is to retain possession of her, and to have an exclusive possession and right to her cabin and other parts for the accommodation of the crew and equipage; and he is to receive and deliver the cargoes. The case, therefore, falls entirely within the reasoning of the supreme court of the United States in Hope v. Groverman, 1 Cranch [5 U. S.] 224, and Marcardier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 39, and must be governed by the authority of those cases. I had occasion to consider the bearing of those cases in The Volunteer [Case No. 16,991]; and to that decision I deliberately adhere. I am aware of the decision in the king's bench and the house of lords in Colvin v. Newberry, 8 Barn. & C. 166, and 6 Bligh, [N. S.] 167, 189, which is distinguishable from the present. But, if it were not, I should, upon reason, as well as the authority of the supreme court, follow out the doctrines in 1 Cranch [5 U. S.] 214, and 8 Cranch [12 U. S.] 39. The mere fact, that the vessel sails under a charter-party, does not divest the absolute owner of his right to salvage, or entitle the charterer to salvage, unless he thereby becomes owner for the voyage. The case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, sufficiently establishes this position.

The next question is, whether Dyer, as joint owner of the cargo with Hunt, is entitled to share in the salvage. And here we must meet the case, exactly as if Hunt were a stranger, and had no interest in the cargo. The question, therefore, resolves itself into this, whether the owner of the cargo, whose property is thus put at risk, without his own consent, by a stoppage or deviation from the voyage for the purpose of earning salvage, is entitled to share in that salvage. In the present case, Hunt was not on board of the brig at the time of the stoppage or deviation, or assenting thereto; and, therefore, Dyer cannot claim any title to share in the salvage, upon the ground, that he, by his partner, assented thereto; and so he would be in the same predicament with the joint charterers, and owners of cargo (Christie and Young,) in the case of Mason v. The Blaireau. As to Dyer, therefore, the stoppage was a clear deviation, and if the cargo had been subsequently lost, Hunt, in a court of equity, if not at law, would have been responsible, as ship-owner, to Dyer, for the full amount of that loss. Has he, then, any title to share in the salvage? In the case of the ship-owner, we all know, that he is now universally held entitled to share in the salvage, upon the general ground, that, by the stoppage and deviation, the ship and the cargo (whether the cargo belong to the ship-owner or not) are put completely at the risk of the ship-owner; and therefore, as he runs the risk, he ought to share in the salvage. If this were the sole ground of the maritime rule on this subject, it would be difficult to distinguish the case of the owner of the ship from that of the owner of the cargo. In each case the property of the owner is put at his own risk, and (it is said) without his consent. In each case (it is also said) there is a remedy over against the master by the owner of the ship for the deviation; and against both of them by the owner of the cargo for the same wrongful act. If this be true and there be nothing further, the distinction between the owner of ship and the owner of cargo would seem to be almost, if not entirely, evanescent. But I apprehend, that there is a foundation for a distinction, established upon maritime policy, as well as general reasoning. In the first place, it is by no means clear, in the case of a deviation by the master for salvage, that although the underwriters are discharged, yet that the master, if he has acted in good faith, and in the exercise of a sound discretion, is responsible to the ship-owner for any subsequent loss occasioned thereby. It is the universal custom, I believe, of all maritime nations, to encourage salvage services and to give suitable rewards therefor, for the very purpose of protecting commerce and navigation upon the high seas, against the extraordinary perils incident thereto. Every merchant has a deep interest in maintaining this doctrine in its fullest extent, if I may so say, in the language of the admiralty upon another subject, sub mutuae vicissitudinis obtentu. I have not supposed, that the master of a ship was, by the nature

and duties of his office, precluded from rendering such services; or that anything short of a positive prohibition of the owner could take away or control his discretion, as to the time, and the manner, and the circumstances, under which such salvage services ought to be undertaken. On the contrary, I have always supposed, that the master had an implied authority, from the nature of his office, to render such services, giving a proportionate share and benefit to his owner, in all cases, where he should deem it to be for the interest of his owner. It is upon this ground, and this ground only, in my judgment, that the owner of the ship can ever entitle himself, in an equitable view, to any salvage whatever, at least, to any salvage beyond the mere compensation for the risk, or the premium of insurance lost. And if ever a case should occur, (which I can hardly suppose) in which a ship-owner should prohibit his master from rendering salvage services, I, for one, should hold him bound to this limited compensation, and leave him to the scanty fruits of his own selfishness, and illiberality. The salvage, ordinarily due to the owner, would, in such a case most properly be awarded to the master, since he would then have borne the whole risk and burthen of the enterprise.

There is, doubtless, another auxiliary ground, upon which the maritime law proceeds, as a matter of policy. It is, that by the owner's becoming entitled to share liberally in the salvage, the master is under no temptation to deviate from his proper duty to his owner by any undue hopes of selfish gain, or by assuming unreasonable or unjustifiable risks. The maritime policy, therefore, which thus links his own interests to those of his owner, is as wise, as it is beneficent. It gives a security to the owner against any abuse of the master's authority, by making the interest of the latter subordinate to that of the former. Now, in respect to both of these considerations, the case of the owner of the ship differs from that of the owner of the cargo. The master is the general agent of the owner of the ship; but he is the special agent only of the owner of the cargo, to carry the same to the port of destination. He has, therefore, no implied authority from the latter to deviate from the voyage for salvage purposes; and the general contract of the ship-owner and master is to deliver the goods at the port of destination, the perils of the seas, and the acts of God, only excepted. The salvage service falls within neither predicament; if it is to save property, and not merely to save life. In the latter case, Christianity imposes a higher duty, the duty of saving life, if practicable, by any reasonable sacrifice. It is impossible, therefore, to infer any consent of the owner of the cargo to the salvage service, which alone would furnish a sufficient ground for him to share in the reward. Neither does the maritime policy, as to temptation of the master to deviate for his own self-

ish objects, apply to the shipper of goods, as it does to the owner of the ship. The former has the double security of the ship-owner and the master, to compensate him for any unjustifiable deviation; the latter must rely solely on the pecuniary ability of the master, and the just confidence reposed in him, as his security and indemnity. The master is under little temptation to deviate from his duty against the shipper, unless he may thereby promote the interest of the ship-owner, as well as of himself. But, at all events, the shipper is content, from the very nature of his contract for the shipment, to rest satisfied with the ordinary responsibility of the owner and master of the carrier ship, for his indemnity against losses occasioned by the misconduct of either.

Thus far, the point has been considered upon principle. But how stands the case upon practice and authority? In the first place, although the case must be of frequent occurrence in suits for salvage, yet it does not appear that any such general claim has ever been allowed in practice, or by courts of justice. The omission to make any such general claim, under such circumstances, cannot but be very significant, and expressive of the general sense of the community. In the next place, not only is there no authority in favor of such a general claim, but there are authorities directly against it. In the case of Bond v. The Cora [Case No. 1,620], the learned judge of the district court, and afterwards on appeal my late brother, Mr. Justice Washington, whose judgments upon all subjects are entitled to very great weight, from his patience of research, and sound discriminating learning, decreed upon full argument against the claim. In Taylor v. The Cato [Id. 13,786], Judge Peters also rejected the claim of the shippers of goods. I follow his reasoning with an undoubting approbation; and think, that it satisfactorily establishes the doctrine, that in ordinary cases the shipper of cargo is not entitled to share in the salvage, unless indeed, he has expressly assented to the deviation, and thereby released the owner of the ship from his responsibility therefor. My opinion, therefore, is, that Dyer is not in the present case entitled to any share in the salvage, and his claim ought to be dismissed.

The merits of the case having been disposed of by the former decrees of the court, a question arose as to the apportionment of a part of the costs. In the course of the admiralty proceedings all the cargo had been delivered on bail and appraisement to the various claimants, except the sugars claimed on behalf of Messrs. Holford and Company, London, by their agents, Messrs. Bates and Company, of Boston. These goods remained in the custody of the court up to the final decree. All the other costs and charges had been made a charge on the whole property in controversy; and the question now put to

the court was, whether the charges of the custody of these goods should be borne exclusively by Messrs. Holford and Company, or should be apportioned, like the other costs and charges, upon the whole property.

The question was briefly spoken to by Blair, for Messrs. Holford and Company, and by Parsons, for the parties having an adverse interest.

STORY, Circuit Justice. I do not think there is any real ground for controversy in the present case. The charges for the custody of these goods ought, like the other costs and charges in the case, to be borne by, and apportioned upon, the whole property saved. In salvage cases, the general rule is that the costs and charges are to be paid out of the property saved, and to be charged and apportioned upon the respective claimants thereof accordingly. The only exceptions, as far as I recollect, which have been admitted, are, where the charges have been occasioned by the gross neglect, or laches, or improper conduct of the claimant himself, in which case they are to be borne be himself alone; or where the right has been forfeited by some gross misconduct of the salvors in the salvage service, in which case the court constantly refuse any allowance to them, and compel the guilty parties to bear their own costs, charges, and expenses, as a suitable punishment ex delicto. This is especially true in all cases of embezzlements and of losses by the gross negligence of salvors. In the present case there is not the slightest ground to impute any negligence, laches, or impropriety to Messrs. Holford and Company, and therefore the general rule must prevail.