### ATLAS STEAM-SHIP Co. (limited) *v.* STEAM-SHIP COLON.

(*Circuit Court, S. D. New York.* July 9, 1880.)

1. SALVAGE—MEASURE OF COMPENSATION.—It is the policy of the law to give a proper salvage remuneration to powerful and well-equipped steamers which render service in saving property that is in peril at sea; but the true character of the individual service must be looked at under the circumstances of each particular case. *Held,* under the circumstances of this case, that the salvage compensation awarded was adequate and liberal.

*Everett P. Wheeler,* for libellant.

*Thomas E. Stillman,* for claimant.

BLATCHFORD, C. J. The steam-ship Colon was one of a regular line of steamers, owned by the claimant, running between New York and Colon. She left New York on the seventeenth of August, 1876, bound for Colon, with 140 passengers, and a crew of 74 men, all told. She was a screw-steamer, built of iron, of 2,686 tons burden, full brig rigged, carrying two courses, two lower top-sails, two upper top-sails, two top-gallant sails, two spencers, forestay sail, main-stay sail, and jib. Her spread of canvas was about 2,200 yards. Her engines were compound engines. She intended to go by the way of the Crooked island passage. On the twentieth of August, about 11 o'clock in the forenoon, she broke her low-pressure crank-shaft in the crank. By the accident two men were killed, the four columns which supported the low-pressure and high-pressure cylinders were broken, and other parts of the machinery were badly damaged. The damage was such that it could not be repaired at sea, and the master decided to make for the port of New York under sail, the propeller being useless.

At the time of the accident the vessel was about in latitude 28 degrees 17 minutes north, and longitude 74 degrees west from Greenwich. She was distant about 731 miles from New York, and 200 miles from the nearest port, which was Nassau, New Providence. Savannah was distant 420 miles, and

Havana about the same distance. In any of those ports the engines could have been repaired. Anchorage could have been found at Watling's island, 248 miles distant, and at Little Bird rock, 326 miles distant. The Colon could have made any of those ports under sail. Aside from the breaking of her machinery, she was entirely stout, staunch, and seaworthy. About half an hour after the accident, the Colon was got under all sail, and her master attempted to wear; but, her propeller not being disconnected, he was unable to do so, and she made headway to the southward about a knot and a half an hour, and drifted to the eastward at about the same rate. The prevailing winds at that season of the year, and in the vicinity where she was, were more favorable for her to proceed to New York, or to some northern port, than to a West India port. It would probably have taken her fourteen days to reach New York under sail alone.

The master of the Colon was exceptionably competent, and had had a wide experience in steam-vessels. For 27 years he had navigated that part of the ocean through which the Colon's route lay. He had frequently tested the ability of the Colon to make headway under sail, and had found she was entirely manageable with the wind on her beam or abaft the beam. These tests were made while the screw was connected with the shaft. The screw of the Colon was attached to the shaft in such a manner that it could be disconnected in less than two hours, and, when disconnected, it would revolve freely and would not interfere with the steering of the vessel. With the screw disconnected the vessel could sail within six points of the wind. At the time of the accident the weather was pleasant and the sea smooth, and the wind light from west-south-west. The part of the ocean where the Colon lay disabled was much frequented by both steam and sail vessels. Steamers running to and fro between New York and Aspinwall passed in the immediate vicinity. So did steamers from the Spanish main, bound to Cadiz and ports in Spain and France. So did sailing vessels bound to and from New Orleans, Mobile, and Havana. The Colon had fresh

provisions and ice sufficient for four or five weeks, and salt provisions, among her stores, sufficient for five months. She carried also in her cargo large quantities of flour, salt meat, and preserved provisions. Her cargo was worth $250,000, and none of it was of a perishable nature.

Shortly after the accident a French brig was boarded by the master of the Colon. The brig offered her services, but they were declined. She could have assisted the Colon in getting her head around to the northward, which the Colon was unable to do unassisted, with the wind as it was, and with her screw connected with the shaft. Owing to the accident to her machinery, it was not convenient for the Colon to detail men to disconnect the screw until the morning of the 22d. Towards 4 o'clock in the afternoon, and about five hours after the accident, the Colon sighted the steam-ship Etna, distant about 10 miles, and soon after hoisted the signal "B. N. D.," which signified that she wished to communicate close. The Etna changed her course and bore for the Colon, and reached her, and the master of the Colon put out a small boat and boarded the Etna. The Etna was an iron steamship of 1,274 tons burden, owned by the libellant, and running regularly between New York and West India ports. She had left Kingston, Jamaica, on the seventeenth of August, bound for New York, where she was due on August 24th, in the afternoon. She carried 39 passengers and a crew of 33 men, all told. Her cargo was worth about $100,-000, and a small portion of it consisted of fresh fruits. The Etna was worth about $100,000. The master of the Colon had an interview with the master of the Etna on board of the Etna, and told him that the machinery of the Colon was disabled, and that he wished the Etna to tow him back to New York. After some negotiation it was agreed that the Etna would undertake the service. The subject of compensation was mentioned, and, at the suggestion of the master of the Colon, it was agreed that that should be left to be determined by the parties in interest in New York, and an agreement in writing was drawn up, and was signed by the two masters, as follows:

"At sea, August 20, 1876, lat. 28 deg. 17 min. N., long. 74 deg. W., on board steam-ship Etna. We, the undersigned, do hereby agree as follows: The P. M. S. S. Colon, being disabled as to her machinery, but in other respects tight, staunch, and strong, asks the Atlas S. S. Etna to tow her, the Colon, to New York. The undersigned, Captain S. P. Griffin, of the Colon, stipulates that compensation for the assistance to be rendered shall be settled by the companies in interest in New York; and the undersigned, Captain J. W. Sansom, of the Etna, accepts the stipulation of Captain S. P. Griffin, and for his part will render the assistance mentioned upon the terms stated.

"S. P. GRIFFIN,
"J. W. SANSOM."

The Etna had only one hawser suitable to assist in towing the Colon. It was a 10-inch hawser, which had been in use on the Etna for two years or more, but was in good condition. The Colon had a larger hawser, new, which had never been used. Before the captains separated it was arranged that both hawsers should be used in towing. This agreement having been made, the master of the Colon returned to his vessel, and the hawser of the Colon was passed to the Etna, and the hawser of the Etna to the Colon. The hawsers were made fast to the after bitts on the quarter-deck of the Etna, on either side, and the Etna resumed her voyage to New York with the Colon in tow. They got under way about 7 o'clock in the evening of the twentieth of August, and arrived off Sandy Hook shortly before midnight on the 25th, and came up the bay early in the morning of the 26th.

During all the time that the service was performed the weather was fine, the sea smooth, and the winds favorable, and during most of the time both vessels carried sail. The vessels arrived in New York safely and without accident, except that the Etna's hawser stranded on the twenty-first, and there was consequently a short stoppage while it was being repaired. In consequence of the inequality in the strength of the two hawsers, they were so arranged that that of the Colon bore more of the strain of towage than that of the Etna.

The Colon, on her arrival in New York, in her damaged condition, was worth about $230,000. She had earned no freight. On the arrival of the steamers in New York, the president of the Pacific Mail Steam-ship Company, which owned the Colon, called on the agents of the Atlas Steamship Company, and asked them to fix a sum for the service rendered, as he desired to transfer the passengers and cargo of the Colon to the Crescent City. No agreement was made, and later in the day the agents of the Atlas Steam-ship Company wrote to said president (Mr. Clyde) that they wished to consider the matter, and that they would communicate with him definitely on Monday, August 28. The transhipment of the Colon's passengers and cargo to the Crescent City was immediately commenced, with notice thereof to the agents of the Etna.

On Monday the agents of the Atlas Company called upon Mr. Clyde and stated to him that they considered the services worth $150,000, and that they would claim that amount. Mr. Clyde replied that he did not think the service was worth any such sum, but that he was willing to pay them fair compensation. There was no further negotiation, and on the following day the libel in this case was filed against the Colon and her cargo, claiming $150,000. The greater portion of the cargo of the Colon was then on board of the Crescent City. Process was issued under the libel, and the Colon and the cargo were both attached. A stipulation for the value of the Colon and her cargo, in the sum of $150,000, was given August 30th. The libel was filed by the Atlas Steam-ship Company, (limited,) for itself and all others. The master, officers, and crew filed petitions to be made co-libellants, and orders to that effect were entered. A salvage compensation of $10,000 was awarded by the district court to the owners of the Etna and to her master and crew. Of this sum $4,375 was awarded to the master and crew, and $750 more to the master. These two sums, amounting to $5,125, have been paid by the owners of the Colon. The cargo of the Etna was shipped under bills of lading which permitted the Etna to tow

and assist vessels in all' situations. Certain consignees of cargo on the Etna, whose goods had been damaged by the detention, filed petitions and became co-libellants. The district court decreed that they should recover the damages sustained by them, and that the Colon should pay the same in addition to the award of $10,000. The damages of these co-libellants were assessed, and, with the costs awarded to them, amounted to $2,200.28, and that sum has been paid by the owners of the Colon. A reasonable allowance to the Etna for damage to her hawser is $75; for repairs to her deck and engine, $300; and for extra coal used, $125. The wear and tear of the engine of the Etna depended on the pressure of steam carried and the number of revolutions made. The cargo of the Colon was shipped under bills of lading which exempted her from liability arising from disasters or dangers of steam navigation. The damage to her engine resulted from a latent defect in the crank-shaft, which could not have been discovered by examination prior to the breakage. None of the officers or crew of the Etna left their vessel at any time to render assistance to the Colon. None of the passengers or property on board of the Colon were transferred to the Etna. The towing voyage to New York was without danger or anxiety. The Colon was equipped with eight sail-boats, large enough for ocean service, which could have been sent, if necessary, to intercept steam vessels or to some port. The engineer's log of the Etna shows that there are entries in it as follows: "August 21st. Forward crank-pin and thrust heating." "August 22d. Still running water on the bearings." "August 28th. Bearings hard to keep cool." It was found that these entries were made nearly two years after the service was rendered and during the progress of the trial in the district court. The libellants endeavored, on the trial in the district court, to prove that they had sustained a loss of $2,300 in freight on account of the detention of the Etna. This claim was abandoned after considerable testimony in regard to it had been taken. The libellants put forth on the trial in the district court exaggerated claims as to items of damage and

disbursements, and gave proof in regard to them, but afterwards abandoned such claims. The district court refused to allow costs to the owners of the Etna

On the foregoing facts my conclusions of law are that the compensation awarded by the district court to the owners of the Etna—$4,875—was adequate and liberal; that costs in that court were properly refused to them; and that they should pay to the claimant its costs of this court.

The claim of the owners of the Etna, in their petition of appeal, is that they are entitled for the salvage service to not less than $25,000, with costs, besides compensation for the actual losses and damage sustained by them in the service, and exclusive of any award to the master and crew of the Etna for their services. In other words, they claim that the $500 should be increased to $1,856.65, and the $4,375 to $25,000. This would make the entire amount paid and to be paid by the Colon $34,181.93, besides costs, and it would make the relative compensation of the owner of the Etna and her ship's company as 4.87 to 1.

There is no appeal by the owners of the Etna from the ratio of distribution of the $9,500. There is no allegation in the petition of appeal that the decree below is erroneous because it did not give to the owner of the Etna a larger proportion of the $9,500 than $4,375, and no allegation that the master and crew should not absolutely have had as much as $5,125, or as much of the $9,500 as $5,125. The ratio of distribution adopted by the district court, if applied to a sum large enough to give to the owners of the Etna $25,000 in place of $4,375, would require that sum to be $54,285.73, so as to give to the master $4,285.73 instead of $750, and to the master and crew $25,000 instead of $4,375; and, adding to this the $1,856.65 and the $2,200.28, would make a total of $58,342.66, exclusive of costs. But the owners of the Etna really contend, on this appeal, that the compensation to them, relatively to the compensation of the ship's company, should be as 4.87 to 1.

Complaint is made that the ship's company receive $750 more than the owners of the Etna; that the ship's company were in the employ of such owners and paid by it, and did little work as compared with the Etna, and little increased work; and that the substantial service was rendered by the steamer, and not by individual exertions. It is also said that the meager character of the award to the vessel will prevent owners of vessels from rendering salvage service; that the employes of the vessel are allowed to use the product of the investment of the capital of the ship-owner to benefit themselves; that if the decree below is allowed to stand as fixing a just measure of compensation to the ship-owner, shipowners will instruct their masters to no longer attempt to save property in peril at sea; and that, in consequence of the decision below, this has already been done by one of the steam-ship lines from the port of New York. These are not commendable suggestions, and it is not to be supposed that other ship-owners will follow the example set in this case of making such unfounded and exaggerated claims as are made in the libel, culminating in a demand for $150,000. If, on the real facts of this case as they appeared to the district court, and as they appear to this court, the consequences intimated shall be arranged for by those who threaten them, they will undoubtedly hesitate to carry them out, if from no other motive, from that of self-interest, lest they themselves may at some time be in the peril with their property to which they propose to abandon the property of others. The considerations suggested are of no force except to injure those who procure their advocates in court to put them forth, and can meet with no favor from disinterested and impartial persons.

It is, undoubtedly, the policy of the law, and it will be the aim of the court, to give a proper salvage remuneration to powerful and well-equipped steamers which render service in saving property that is in peril at sea. But the true character of the individual service must, under the circumstances of each particular case, be looked at. In the present case, the acts of the master of the Etna at the time show most dis-

tinctly what he understood the exigency to be. The agreement signed voluntarily by him, and under no stress, pressure, or compulsion, shows his view of the situation of the Colon, and of the service required of the Etna. There is no claim that the situation was misrepresented to him, or was misunderstood by him. The Colon was disabled as to her machinery, but was in other respects tight, staunch, and strong, and needed no assistance but towage. The Etna towed her to the port to which the Etna was bound. For the time occupied in the towage the compensation of $4,375 is at the rate of over $33 an hour. The delay to the Etna was 36 hours.

It is speculation and conjecture to assume that disaster would have overtaken the Colon because of her location, or of her drifting, or of a change of weather, or of her being deprived of the use of her steam machinery, or of any shortness of provisions. Anything may happen, but there is no evidence on which to found a reasonable belief that disaster would have happened to the Colon or her cargo from any one of those causes.

The evidence does not show any serious risk to the Etna, with proper management of her machinery. It is to be assumed that her machinery was properly managed. She was not asked to improperly manage her machinery in towing, or to tow at too rapid a rate, with injury to the machinery, when the machinery could have been properly managed, and the towing could have been done at a less rapid rate without injury to the machinery. Improper use of the machinery, when it could as well have been properly used, is not to be laid to the account of the Colon. The evidence as to the actual results of the towing on the machinery of the Etna shows that the risk of breaking it down by the towing was very small. On the evidence the risk of the Etna exhausting her fuel was very small. As to the risk of the Etna's receiving nothing if her machinery had given out, or her coal been exhausted before reaching New York, it is clear that, as the service by the agreement was towage towards New York, the

Etna would have been entitled to compensation for such towage as she gave, if she had been compelled by either of the causes named to give up the towage, provided the Colon had reached New York safely. There is no reason to suppose she would not have reached New York safely

The amount awarded by the district court for the service seems to be fully adequate, in view of the amounts awarded in the various cases cited on the part of the libellant as well as of the claimant, under the circumstances of those cases as compared with the circumstances of this case.

As to the distribution made by the district court, if $10,-000 is the proper total sum, as it is, the owners of the Etna can have no larger share of it (besides the $500) than the $4,375, as they do not appeal from the award to the master of $750, and to the master and crew of $4,375, and those sums have been paid. It was proper for the district court to refuse costs to the owners of the Etna because of the exorbitant and unfounded claims they brought forward, and the expense and trouble to which they wantonly subjected the claimant.

The owners of the Etna should have a decree for the same amount as in the district court, without the costs of that court, and should pay to the claimant the costs of this court.