### THE PERSIAN MONARCH.[1]

### GOLDSMITH v. NORTH GERMAN LLOYD, etc.[1]

*(District Court, E. D. New York. September 17, 1884.)*

SALVAGE—OWNER OF CARGO ON SALVING VESSEL AND CARE-TAKERS OF CARGO NOT ENTITLED TO SALVAGE OR DAMAGES—PUBLIC POLICY.

The owner of cargo shipped on board a vessel which, by reason of rendering a salvage service to another vessel on the voyage, is delayed, and whose cargo is thereby damaged and deteriorated, is not by that mere fact made entitled to a salvage remuneration from the vessel to, which the service was rendered. Such an allowance would be against public policy. Nor is he entitled to recover damages from the salved vessel, either for a tort or for a breach of contract. Men employed by the shipper as care-takers of such cargo (which consisted in this case of live-stock) are not entitled to a salvage award, when they took no part in the actual salvage service, but merely were compelled to perform the duties for which they had been hired during the time the voyage was delayed.

In Admiralty.

*Butler, Stillman & Hubbard,* for libelants.

*Shipman, Barlow, Larocque & Choate,* for defendant.

BENEDICT, J. This action is brought by Meyer Goldsmith, the owner, and Dan Kalahr, Eugene Kalahr, and John H. Topham, the care-takers of certain cattle and sheep shipped by Goldsmith on board the steam-ship Persian Monarch, to be transported therein from New York to London. The defendant is the owner of the steam-ship Hannover, which vessel, when disabled at sea, was fallen in with by the Persian Monarch during the voyage aforesaid, and by her towed into a port of safety.

The libel sets forth the bill of lading under which the cattle and sheep were shipped, containing the following clause:

"The steamer has liberty to sail with or without pilots, to make deviation, to call at any port or ports for any purpose, and to tow and assist vessels in all situations."

It then describes the services rendered the Hannover, and avers that the rendition of those services necessarily put in peril the sheep and cattle shipped, and subjected their owner to expense in maintaining

[1] Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.

them for a longer period than otherwise would have been required, and to loss by reason of the death of some, and the depreciation in value of the remainder, owing partly to their being kept for so long a time in confined space, and partly to their being fed reduced rations, as well as to loss by reason of losing a market by the delay.

The libel also avers that Dan Kalahr and Eugene Kalahr were employed by Goldsmith to take care of the said sheep and cattle during the voyage, and by reason of the rendition of the salvage services aforesaid, they were compelled to give the cattle and sheep greater care and attention than otherwise would have been required of them. John H. Topham sets forth the same by way of petition to be made a co-libelant. The prayer of the libel is that the court would "decree to the libelant Meyer Goldsmith the sum of $15,000, or such other sum as this court deems proper and reasonable, and to the libelants Dan Kalahr and Eugene Kalahr such sum as is proper and reasonable in the premises," and for such other relief, etc.

The view I take of the case renders it unnecessary to say more in regard to the proofs offered in support of the libel than that they show that while performing the voyage in the libelants' bill of lading described, the Persian Monarch fell in with the steam-ship Hannover disabled at sea, and at her request took her in tow and brought her in safety to the port of Falmouth, whence the Persian Monarch proceeded to London, where she arrived some five days later than she would if the voyage had been performed in the ordinary time of a voyage from New York to London. The length of the voyage caused a deterioration of the sheep and cattle, owing to a lack of full rations of food, and to a crowding of the cattle and sheep, rendered necessary in order to make room to attend to the cables by which the Hannover was towed, and 15 of the sheep died. The libelants Dan Kalahr and Eugene Kalahr and the petitioner, John H. Topham, were 3 of 15 men put on board the Persian Monarch by the shipper of the cattle and sheep to feed and care for them during the voyage. These men were hired by the run, and the length of the voyage entailed upon them additional labor in caring for and feeding the cattle and sheep. The libelant Goldsmith was not on board the Persian Monarch, and had nothing personally to do with the towing of the Hannover. His cattle and sheep in no way contributed to the successful performance of the services rendered the Hannover. On the contrary, they were, if anything, a hindrance.

These facts show that beyond all question a salvage service of importance was rendered by the Persian Monarch to the Hannover on the occasion referred to, and the first question to be considered is whether the shipper and owner of the cattle and sheep on board the Persian Monarch was one of the salvors on that occasion, and as such entitled to recover of the owner of the Hannover a salvage reward.

In behalf of the shipper, it has not been contended that the bare fact of ownership on board a salving ship gives a right to share in

salvage when awarded, but it is contended that the owner of cargo on a salving ship, who consents to the rendition of the salvage service, is entitled to share in the salvage, when he, by consenting, assumes a risk which, in the absence of his consent, would be borne by the salving ship; and, it is claimed in the libelant's behalf that the clause already quoted from the bill of lading given for the cattle and sheep was a consent by him that the Persian Monarch should tow the Hannover as she did, and that such consent put the sheep and cattle at the shipper's risk, and so entitles the shipper to recover salvage. In support of this position two decisions are cited. They are the case of *The Blaireau,* 2 Cranch, 240, decided by the supreme court, and the case of *The Colon and her Cargo,* 10 Ben. 60, decided by the district court of the southern district of New York. Reference is also made to the case of *The Nathaniel Hooper,* 3 Sum. 542.

The case of *The Blaireau* was a case where the owner of a cargo of salt on the salving vessel, the Firm, was allowed to share in the salvage awarded. This allowance Judge PETERS (*The Ship Cato,* 1 Pet. Adm. 67) speaks of as "a remuneration not common, if ever made before;" and whether the decision was "for general direction or only as it respects that particular case," he considers open for determination. The case of *The Blaireau* had this peculiar feature that one of the owners of the cargo, whose acts were held to bind the other owner of the cargo, was on board the Firm at the time she saved the Blaireau, and this owner not only took an active part in the labor attendant upon the service, but, as the opinion indicates, was called on to consider, and did consider, and assent to, the measures taken by the master of the Firm to effect the salvage. Moreover, I gather from the case that the salvage service would not have been undertaken by the master of the Firm if the owner of the cargo on board had not approved the measures intended to be adopted to save the Blaireau. This act on the part of the owner of the cargo was something more than a mere waiver of any right of action against the Firm because of a deviation. It was an express assent to measures intended to be taken to save the Blaireau, given under circumstances that rendered the assent an essential prerequisite to the service. Such I understand the case of *The Blaireau* to have been, and so understood, it furnishes no authority for the decision of this case. Neither can authority for the decision in this case be found in the opinion delivered by Judge STORY in the case of *The Nathaniel Hooper.* In that case it was found that no consent was given by the owner of the cargo. The nature of a consent which would, in the opinion of that learned judge, afford ground for the owner of the cargo to share in salvage was not determined, except that the consent must be an express consent to the deviation made, and a consequent release of the ship-owner from his responsibility therefor.

If, in the case at bar, there had been an express consent by the shipper of the cattle and sheep that the master of the Persian Mon-

arch do what he did to save the Hannover, the remarks of Judge Story in the case of *The Nathaniel Hooper* would have been more in point. The decision in the case of *The Nathaniel Hooper* does, however, point out that the mere fact of owning property put at risk is not sufficient to confer the right to share in salvage, and shows that the owner of the ship is allowed to share in the salvage upon grounds of public policy, as well as upon the ground that the cargo has been put at his risk. Another ground is stated by Judge Betts, (*The Waterloo*, Blatchf. & H. 114,) namely, that the property of the ship-owner is the instrumentality by which the salvage is effected. None of these auxiliary grounds for an award exist in the libelant's case. The libelant was not on board the Persian Monarch, knew nothing of the Hannover's application for assistance, and was not impelled by her distress to relinquish any right or to assume any additional risk. The form of his bill of lading is not shown to have been known by the master of the Persian Monarch, nor did it in any way conduce to his determination to assist the Hannover. The master, as it must be presumed, arrived at the determination to assist the Hannover from a sense of the duty owing by him to the distressed vessel,—a duty created by the circumstances, and which would have been the same if the libelant's bill of lading had contained an agreement on the part of the ship never to render assistance to a vessel in distress.

The consent given in the case of *The Blaireau*, as well as the consent referred to in the case of *The Nathaniel Hooper*, is, in my opinion, to be considered as a consent given at the time of the rendition of the salvage service, and under circumstances showing that without such consent the salvage service would not have been undertaken. The case at bar discloses no such consent.

As to the other decision relied on by the libelant, (the case of *The Colon*,) that is a decision directly adverse to the libelant's claim, considered as a claim for salvage, for although there was in that case a bill of lading containing a clause similar to that in the libelant's bill of lading, the claim for salvage was rejected. In that case the clause in the bill of lading was held to have no effect upon the shipper's right to salvage, because the bill of lading was a contract between the shipper and his ship alone. To this extent I agree with the decision in the case of *The Colon*. The libelant's bill of lading is, as I conceive, nothing more than his contract with the owner of the Persian Monarch. In it he gave to the Persian Monarch liberty to assist any vessel in distress, and for this waiver he received a consideration in the rate of freight paid by him. It is a mere waiver, and nothing more.

If, then, the form of the libelant's contract with the Persian Monarch has no effect upon the liability of the owner of the Hannover, the libelant's claim for salvage is left to rest upon the bare fact that the rendition of the salvage service to the Hannover increased the libelant's risk in the cattle and sheep on board the Persian Monarch.

Such a fact standing alone has never, so far as I know, been held to be foundation for a claim for salvage, and, indeed, has not been here claimed to be sufficient.

A second ground upon which salvage has been claimed in behalf of the libelant is the co-operation in the salvage service of the cattle-men employed by him to take care of the cattle and sheep during the voyage. But the salvage service consisted in the towing of the steamship Hannover by the steam-ship Persian Monarch. The libel does not aver that the cattle-men took part in that service. These men took care of the cattle and sheep as they had agreed with the shipper to do. The rendition of the salvage service by the Persian Monarch did not entitle them to demand extra wages of the libelant, and, so far as appears, they have asked no extra compensation of him. In fact they are here claiming on their own behalf as salvors compensation for their services in caring for the cattle and sheep. Their labors performed under such circumstances can have no effect upon his right to claim salvage of the Hannover.

In what has been said the effort has been to show a distinction in principle between the shipper's consent, proved in the case of *The Blaireau*, and alluded to in the case of *The Nathaniel Hooper*, and the waiver embodied in the libelant's bill of lading. But if there is no distinction in principle between the case of *The Blaireau* and the case at bar, then a distinction must be made upon the ground of public policy. Public policy, which is the sole and the good ground upon which salvage is awarded in any case, requires that salvage should not be awarded in a case like this, for the reason that to award it is to sow the seed of death to the law. It would open a door for every shipper of cargo, and every passenger as well, to claim a share in any salvage award that might be earned by their ship. If, in former times, when ships were small and cargoes of little value, it was possible to allow shippers of cargo to share in the division of salvage, such allowance is no longer possible. The vast steamers of the present day carry cargoes valued by millions, and their passengers are numbered by thousands. If all these are to share in the distribution of salvage, the amount coming to the master, who alone decides whether a salvage service is to be rendered, and to the mariners, whose personal exertions are in general necessary to success in any salvage adventure, will be so small as to furnish no inducement to undertake the service, and so the reason for awarding salvage will fail. The same considerations of public policy which impel to the allowance of salvage therefore require that in the distribution of salvage neither shippers of cargo, nor passengers on board the salving ship, can be allowed to participate.

Thus far this case has been treated as a cause of salvage, civil and maritime. But the averments of the libel perhaps require that the cause be only considered as not one of salvage, but an action for damages. The decision in the case of *The Colon*, already referred to, is in

favor of such an action, but I am by no means able to follow that decision. If the shipper of these cattle and sheep has a right of action against the owner of the Hannover to recover damages for the detention of his property, such right must arise out of a tort or the violation of an agreement. Surely the owner of the disabled Hannover committed no tort when he accepted the services of the Persian Monarch to bring him to a place of safety. And what contract did he make with the libelant when he accepted those services? It is said that a contract between the libelant and defendant to pay the resulting damages is to be implied from the detention of the libelant's cattle and sheep in their voyage. But the defendant knew nothing of the libelant, or that he had cattle and sheep on board the Persian Monarch. He knew the Persian Monarch carried cattle and sheep, but, for aught that he knew, they were the property of the master with whom he was dealing. It was the master of the Persian Monarch who detained the Persian Monarch and her cargo in the voyage, not an agent of the owner of the Hannover, nor yet the mere bailee of the libelant's property, but the master of the ship; "not an ordinary agent, but one of a special kind—*sui generis*," (*The Thetis*, 22 Law T. Rep. 276;) "a known and public officer," (2 Pet. Adm. appendix, 75,) charged with important duties, not the least important of which are those attaching upon the meeting a vessel in distress at sea. He it was who delayed his ship in order to rescue the Hannover, and he must answer to the libelant if he invaded any right of the libelant by so doing. His answer has been made easy by the form of the libelant's bill of lading, but it is not easier than the answer of the owner of the Hannover, who can truly say to the libelant: "I had no control over the Persian Monarch or her voyage. I never dealt with you nor with your property."

The decision in the case of *The Colon* has sometimes been treated as if in that case salvage had been awarded under the name of damages. But the law is not evaded by a change in name, nor was there an attempt in the case of *The Colon* to evade it in that way. The decision was that salvage could not be recovered, but there could be a recovery of damages for the violation of an implied promise to pay the owner of the cargo of the sailing vessel the damages resulting from their detention. I am unable to agree to such a conclusion. It seems to me that it is adding a new horror to shipwreck to hold that when the master of a vessel in distress accepts the services of another vessel for his rescue, he binds his owners to the owners of the cargo of such other vessel,—and not only to the owners of the cargo, but to the passengers as well,—by a contract to pay them all damages resulting from the rendition of the salvage service. Such cannot be the law.

I have now stated reasons which, to my mind, are sufficient to compel a dismissal of the claim of the libelant Goldsmith, and it is therefore unnecessary to consider the other and weighty matters set up in

defense. What has been said in regard to the claim of the owner of the sheep and cattle refers with equal force to the men employed by him to care for his cattle during the voyage. These men hired out to the shipper by the run, taking the risk of the master of the Persian Monarch's determining to run his vessel slow or fast during the voyage. The fact that the Persian Monarch ran slow during part of the voyage, in order to assist the Hannover, gives to these men no right to claim of the owner of the Hannover compensation for a service in which they do not claim in their libel to have taken any part.

The libel is dismissed, and with costs.