COMPAGNIE COMMERCIALE DE TRANSPORT A VAPEUR FRANCAISE et al. v. CHARENTE STEAMSHIP CO., Limited, et al.

(Circuit Court of Appeals, Fifth Circuit. December 12, 1893.)

No. 144.

1. SALVAGE—WHAT CONSTITUTES SALVAGE SERVICE.

A steamship broke her propeller shaft while on her way from Tampico to New Orleans. A strong norther had been blowing the day before, but both wind and sea were moderating. Her sails were set, but, owing to insufficient wind, it was difficult to keep her upon her original course, and she was consequently kept off to the eastward. Her captain was confined to the cabin by an accident, but he had efficient officers, and the sails, rudder, and steering gear were in perfect condition. Under these circumstances, a passing steamship was asked for towage, and, at some risk to herself, a wire hawser and heavy chain cable were got aboard, and the vessel towed to New Orleans. The towing vessel was delayed two days in arriving at that port. *Held*, that while the danger to either vessel was not extreme, yet the service was a salvage service requiring a liberal reward.

2. SAME—COMPENSATION.

A salved vessel was insured for £1,400,000, but her value, as fixed by a survey after arrival in port, was $110,000. The district judge accepted the full amount of the insurance as her value, which, added to the value of the cargo, gave $379,800. Of this amount, one-twelfth was allowed as salvage. *Held*, that it was error to accept the amount of the insurance as against the positive valuation, and that sufficient compensation would be given by taking the latter amount, and allowing the same rate, which would give $18,716.

3. SAME—DISTRIBUTION—CARGO OF SALVING VESSEL.

Cargo carried by a salving vessel is not entitled to share in the salvage when it receives no damage or injury because of the service; nor does any implied agreement to share therein arise from the acceptance of a bill of lading in which the right to render aid to vessels in distress is specially reserved. The Persian Monarch, 23 Fed. 820, followed.

4. SAME.

The giving of a liberal proportion of the salvage awarded to the officers and crew, the direct actors in the service, is considered the better policy, and of $18,716 given as salvage $5,275 was decreed to them.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This was a libel for salvage filed by the Charente Steamship Company, Limited, and others, against the steamship Dupuy De Lome, of which the Compagnie Commerciale de Transport a Vapeur Francaise and others are claimants. There was a decree for libelants, finding the salved property to be worth $379,800, and awarding one-twelfth thereof as salvage (55 Fed. 93), and the claimants appeal.

The steamship Dupuy De Lome, belonging to the appellant company, while on a voyage from Antwerp, via Tampico, to New Orleans, at about half-past 2 on the morning of May 22, 1892, and while 97 miles on her course from Tampico towards New Orleans, broke her propeller shaft. There had been a strong norther blowing at Tampico the day before, causing quite a heavy sea, but both wind and sea were moderating. At the time of the accident the master, who was confined to his room by a lame ankle, called a consultation of his officers and the principal members of the crew, and it was determined to endeavor to reach Tampico under sail. All sail was made, but from insufficient wind it was difficult to put her on her course to the westward, she keeping off to the eastward. At about 8 o'clock a. m. the steamship Engineer, belonging to the appellee company, which had left Tampico about six hours after the Dupuy De Lome, bound also to New Orleans, hove in sight, a boat was lowered from appellant's steamship and sent on board, and towage asked. The only understanding had was that the Engineer was to take the disabled ship in tow to New Orleans, the compensation to be settled by arbitration. The greater part of the day was spent in getting hawser and chains run between the vessels, one wire hawser having been parted, and one of the heavy cable chains of the Dupuy De Lome run in its place. At about half-past 4 that afternoon they got under way, and reached South Pass Thursday, the 26th, having occupied two days longer, on account of the towing, than was usually required for the voyage. In addition to the libel for salvage filed by the appellees, an intervening libel was filed by Rousseau, Latour & Co., owners of a portion of the cargo of the Engineer, the salving steamship, who claimed a portion of any salvage awarded on account of the risk which their property had incurred on account of rendering such service. The district court found the value of the property to be $379,800, and awarded one-twelfth of it for salvage, and dismissed the intervening libel. From the judgment, the claimant company and the interveners have appealed.

W. W. Howe and S. S. Prentiss, for Compagnie Commerciale, etc.
John D. Rouse and William Grant, for Rousseau, Latour & Co.
J. McConnell, for Charente Steamship Co.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge (after stating the facts). This steamship was so far disabled as to be in need of assistance to enable her to complete her voyage, and, although not in immediate peril, was so in distress as to justify the use of the term "salvage" in designating the aid she required. We fail, though, to find anything in her condition or position that would justify the belief that she was in danger of being driven ashore, as is claimed. It was remarked by the learned judge in the case of The Colon, 4 Fed. 469:

"It is speculation and conjecture to assume that disaster would have overtaken the Colon because of her location, or of her drifting, or of a change of weather, or of her being deprived of the use of her steam machinery. Anything may happen, but there is no evidence on which to found a reasonable belief that disaster would have happened to the Colon or her cargo from any of these causes."

We consider such language is peculiarly applicable to the case at bar. Although the master was, for the time, confined to his room, it appears that he had efficient officers, and his holding a consultation with them and the crew as to what was most advisable to do under the circumstances, instead of being an evidence of his knowl-

edge of the danger to which they were exposed, was but in compliance with the marine law of his nation. The rudder and steering gear of the vessel were in perfect order, as were also the sails, and with the weather that is shown to have followed for the next four days we do not consider there would be a question of her ability to avoid any dangerous place on the coast until she could come to safe anchorage or procure other assistance. Although there has been some question as to the course in which she was moving, we are satisfied that the record shows that she was making to the eastward, and going further from the coast, at the time, which was the reason of taking in the sails. She could have unquestionably continued that course until a change of wind, which is shown to have soon taken place, would have enabled her to either make Tampico or some other safe anchorage. The norther which had been blowing had greatly moderated, both wind and sea had in a great degree subsided, and a small boat had no difficulty in carrying the lines back and forth between the vessels.

But although it does not appear that the peril was great or immediate, yet the future was uncertain, and it was the part of wisdom to procure aid as soon as possible. The danger encountered by the Engineer in lying by the Dupuy De Lome while taking the hawser and cable on board and in the towing, was more than that of ordinary navigation, and a risk that steamship owners should not be called upon to encounter without a liberal compensation. The Daniel Steinman, 19 Fed. 918, and cases there cited. The size of the chain cable in this case which had to be taken in over the quarter necessitated extra diligence, skill, energy, and labor to avoid disaster, and it was carefully and successfully handled.

There is no question regarding the value of the cargo of the Dupuy De Lome, but in regard to her value there appears to be one of importance, particularly as the salvage awarded has been a proportionate amount of the entire value of the property saved. Upon that question there are two items of evidence: First, the fact stated by the master that she was insured for f1,400,000, of which the owners took f350,000, or one-fourth; and, second, the evidence of the valuation placed upon her by a board of survey after her arrival in this port, and the testimony of Conway & Baker, surveyors, upon that point. The two amounts so testified to differ by a large amount, the surveyors finding the value to be but $110,000. It is the value of the property which is restored to the owners that is to be considered, and of which a proportion is to be awarded as salvage in salvage cases, and not the original value imperiled.

While the amount for which a vessel may have been insured may be considered as a circumstance in arriving at its value after marine disaster, it is not direct testimony to that effect, nor can it be considered as conclusive as against a positive valuation. There was no appraisement asked of the court by libelants, nor did they introduce any evidence to show a different value of the property, at the time when it became subject to salvage, than that stated by the witnesses. In accepting as the true value of the vessel the full

amount of the original policy of insurance (of which the owners bore one-fourth, and which must have covered all prospective earnings for the voyage, as they were not permitted to further insure the freight), and ignoring the testimony of their surveyors, we consider the learned judge below inadvertently erred. It is true, as contended, that appellate courts dislike to disturb salvage awards in amount, yet it has always been held that, where there has been any clear and palpable mistake, it is the duty of such court to correct it. The Blackwell, 10 Wall. 1; The Bay of Naples, 1 C. C. A. 81, 48 Fed. 737. Perhaps the true value of the vessel exceeded that put upon it by the board of survey, but, if so, we consider that the very liberal rate given would be an ample award for the service rendered, even though there might be an increased value beyond that. The exact value of the property saved, where large, is but a minor element in computing salvage, and, as it increases, the rate per cent. given is rapidly reduced. It is a compensation for actual service rendered, and a reasonable gratuity for the benefit of commerce, that is contemplated, and not a fixed percentage of the property saved. In considering an amount to be awarded herein, cases of similar class and character to this one are not infrequent, and precedents are numerous. Wherever the very large amounts, as cited in behalf of libelants, have been awarded, there have been peculiar circumstances to justify them that are not found in this case.

In the case of The City of Berlin, Mitch. Mar. Reg. April 28, 1882, where £8,000 was given, the value of the salved property was £237,-198, the salvor ship £88,000, and there was a detention of 10 days. In the case of The City of Richmond, Id. Feb. 27, 1880, where £7,000 was awarded, the value of the property aided amounted to £509,929, and the disabled steamer had nearly 500 passengers on board. In the case of The Silesia, Id. June 25, 1880, where £7,000 was likewise given on a value of £108,000, the salving vessel had on board a large number of passengers, and deviated from her course six days. In The Camona, Ship. & Mer. Gaz. Feb. 20, 1885, the disabled vessel had on board, as a part of her cargo, more than 800 head of cattle, with provisions for but a few days, and it had been decided to throw a large number overboard if help did not soon appear. The salving vessel had on board 350 passengers, and the towage was a distance of 700 miles. In that case £6,000 was given on a value of £64,000. In The Daniel Steinman, 19 Fed. 918, the disabled vessel had 335 steerage passengers, with a crew consisting of but 14 all told. She had but two masts, and could spread but a small amount of canvas for a vessel of her size. The opinion of Judge Benedict shows plainly that the presence of the large number of passengers was considered by him an element which entered largely into his determination of that case, and a salvage of $25,000 was given.

In The Italia both steamships, the salved and the salvor, were carrying a large number of passengers. The value of the Italia was $473,421, and that of the salving vessel $400,000. The weather, at the time of towing, was at times stormy, and the path over which

they had come subsequently swept by severe gales. The towage occupied the same time as in this case. 42 Fed. 416. In the case of The Severn, which, after having been driven about the ocean for 35 days with her main shaft broken, and mail and passengers on board, was picked up and towed into port with some difficulty, a salvage of £3,500 was given on a valuation of £66,700. Mitch. Mar. Reg. July 28, 1882. The Bywell Castle, with her shaft broken, was towed into Halifax in five days,—a distance of 876 miles. The salvor steamship had upwards of a thousand persons on board as crew and passengers. £3,000 was given on a valuation of £31,118. Id. Aug. 12, 1881. In The Colon, 4 Fed. 469, where the time occupied in the towage was the same as in this, but the actual detention was 12 hours less, and where the value of salved vessel and cargo was $480,-000, a salvage of $10,000 was given, with a further amount of $2,200 for damage sustained by the salving vessel. In the case of The Gallego, 30 Fed. 271, valued at $476,764, towed into Havana with some difficulty, $2,500 was given, and in that of The Alaska, 23 Fed. 597, $26,039, or 2½ per cent. of the value of the salved vessel and cargo.

Numerous other instances are found where amounts have been given much less than we think may be allowed in this case; but it is unnecessary to review or compare them, as each has its peculiar circumstances which have tended to increase or diminish the amounts awarded, in the view of the tribunal deciding it. In this case we find none of the elements of what may be termed a high grade of salvage service, and we think the judgment of the court below should be modified, certainly to the extent that we consider an error was made in determining the value of the property saved. We consider the rate given sufficiently liberal to compensate fully for any excess in value that there may have possibly been. The rate allowed in the court below upon the value, as testified to by the witnesses, would give $18,716, which is as much as we consider the circumstances of the case will justify. In the court below the amount awarded was distributed, five-sixths to the steamship, and one-sixth to the master and crew. Salvage after the compensation for the actual service rendered is a bonus—a gratuity—for the benefit of commerce, as an encouragement for like services and efforts, and, as was forcibly declared in the case of The New Orleans, 23 Fed. 909, "no amount of reward to owners and machinery will so stimulate and encourage efforts to save life and property in peril on the high seas as will moderate rewards to masters and crews who are on hand to control the ship and machinery, and are the effective agents to set the machinery in motion;" and we consider public policy is better served by a larger proportion given to the direct actors. We find from the very convenient compilations of the amounts of salvages awarded steamers for rendering services in towing other steamers when disabled, found in Pritchard's Admiralty Digest (volume 11, pp. 2119, 2120), that in the distribution of such awards the portion given the officers and crew has varied from a fourth to a third,—very seldom less than the former proportion, and more frequently the latter. In this case we consider that the one-third

would not be an unreasonable share; but in this case there has been no appeal on behalf of the officers and crew from the decree fixing their amounts, and, although we consider a larger proportion might well have been given them, we do not desire to increase the amount decreed them by the court below. The sum of $5,275 (the same amount given in the former decree) will be awarded to the officers and crew of the steamship Engineer in the same proportions as were awarded them therein, and the sum of $13,441 to the Charente Steamship Company, Limited, owners of the steamship Engineer.

In the matter of the intervening libel of Rousseau, Latour & Co. et al., we consider the reasoning of the learned judge in the case of The Persian Monarch, 23 Fed. 820, which we cordially approve, is conclusive. The property of the interveners in no way assisted in rendering the service, nor received any damage or injury from it. It would be most strongly against public policy, upon which salvage is founded, to permit the owner of every shipment in a cargo to claim a portion of any salvage award earned by the efforts of the officers and crew, and the use of the machinery and power of the ship in which it was carried. The accepting a bill of lading in which was specially reserved the right to render aid to vessels in distress was no such consent on their part to the rendering of such service as could entitle them to a portion of what was so earned. The Persian Monarch, 23 Fed. 820; The Nathaniel Hooper, 3 Sumn. 542, Fed. Cas. No. 10,032; The Waterloo, 1 Blatchf. & H. 114, Fed. Cas. No. 17,257; The Colon, 10 Ben. 60, Fed. Cas. No. 3,024; The Brixham, 54 Fed. 540. The decree dismissing the intervening libel is so far affirmed.

It is ordered that the decree upon the libel below be reversed, and the cause be remanded with directions to enter a decree for the libelants for the sum of $18,716, with costs, and of said amount $5,275 be awarded to the officers and crew of the steamship in the proportion of their rank and pay, as before decreed, and the sum of $13,441 to the Charente Steamship Company, owners of the steamship Engineer; and that appellees pay the costs of the appeal.